RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0272p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CINDY SHADRICK, Administratrix of the Estate of
Tyler Butler, deceased,

*Plaintiff-Appellant,*

*v.*

No. 14-5603

HOPKINS COUNTY, KENTUCKY, et al.,

*Defendants,*

SOUTHERN HEALTH PARTNERS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:11-cv-00033—Joseph H. McKinley, Jr., Chief District Judge.

Argued: March 5, 2015

Decided and Filed: November 6, 2015

Before: GRIFFIN and STRANCH, Circuit Judges; STEEH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEYBATHURST ATTORNEYS, Prospect, Kentucky,
for Appellant. Robert F. Duncan, JACKSON & KELLY, PLLC, Lexington, Kentucky, for
Appellee. **ON BRIEF:** Gregory A. Belzley, BELZLEYBATHURST ATTORNEYS, Prospect,
Kentucky, for Appellant. Robert F. Duncan, Margaret Allison Moreman, JACKSON & KELLY,
PLLC, Lexington, Kentucky, for Appellee.

   STRANCH, J., delivered the opinion of the court in which STEEH, D.J., joined.
GRIFFIN, J. (pp. 34–47), delivered a separate dissenting opinion.

_____

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan,
sitting by designation.

---

**OPINION**

---

STRANCH, Circuit Judge. Hopkins County contracted with Southern Health Partners, Inc. (SHP), a private, for-profit corporation, to provide medical services to inmates housed at the Hopkins County Detention Center (HCDC) in Madisonville, Kentucky. On April 8, 2010, twenty-five year old Tyler Butler entered the jail to serve a short sentence for a misdemeanor offense. He died three days later from complications of an untreated methicillin-resistant staphylococcus aureas (MRSA) infection.

Butler's mother, Cindy (Jimenez) Shadrick, filed suit under 42 U.S.C. § 1983, alleging that SHP's failure to train and supervise its LPN nurses employed at HCDC violated Butler's constitutional right to adequate medical care. She also alleged that SHP was negligent under state law. The district court granted summary judgment for SHP on both claims. *Jimenez v. Hopkins Cnty.*, No. 4:11-CV-00033, 2014 WL 176478, at *19–20, 22–23 (W.D. Ky. Jan. 13, 2014). Because the record demonstrates that there are genuine issues of material fact on the § 1983 claim and SHP is not entitled to share the county's governmental immunity on the state-law claim, we REVERSE the grant of summary judgment in favor of SHP and REMAND the case to the district court for further proceedings.

## I. FACTS

Butler arrived at HCDC close to five o'clock on the afternoon of Thursday, April 8, 2010. He was late for his scheduled intake appointment, having walked from his residence. While Butler stood outside the door, Sherri McDowell, control tower operator, saw Butler put something in his mouth and swallow it. McDowell relayed her observation to Deputy Angela Peterson who, along with Deputy Rodney Knox, started Butler's booking procedures.

As Deputy Knox helped Butler change into a prison uniform, Butler vomited twice. Deputy Peterson noticed that Butler appeared to be under the influence and was sweating profusely. As she asked him questions to complete intake paperwork, his demeanor deteriorated and he had difficulty standing up.

Butler told Deputy Peterson that he had an MRSA infection and he was under a doctor's care for high blood pressure, rheumatoid arthritis, gout, and osteoporosis. He listed several prescribed medications he was taking, including Prednisone, Seroquel, Allopurinol, and Colchicine.[1] Butler denied drug or alcohol addiction.

Deputies Peterson and Knox did not want to admit Butler to HCDC due to his condition. Deputy Peterson asked Sgt. Carl Coy if she could refuse admission to an inmate who reported to HCDC pursuant to a court order. Sgt. Coy replied, in alignment with HCDC's written policy, that only the medical staff possessed authority to refuse admission of an inmate for health reasons.

Deputy Peterson asked Candace Moss, SHP's licensed practical nurse (LPN) and the only medical staff member on duty at the jail, to come to the booking area. It was 5:25 p.m., shortly before shift change at 6:00 p.m. Moss knew she had to decide whether to admit Butler to HCDC. He told her that he had frequent staph infections, that he was suffering from a staph infection in his groin area that his doctor had not examined, and that he had been vomiting, which he attributed to the staph infection. He also reported having a different rash that his doctor had not diagnosed.

As Moss talked with Butler, Deputy Jennifer Chambers noticed that Butler's skin was clammy, he was almost gray in color, and he was bloated. She saw Butler lift his shirt and pants legs to show Moss open wounds on his skin. He pulled his pants down slightly to show Moss part of his groin area. Deputy Chambers heard Butler say, "I have staph infection all over me . . . it's in my groin. . . . I don't need to be here."

Moss instructed the deputies to admit Butler to the jail. As an LPN, she knew she lacked the credentials to diagnose any illness, but she was aware that MRSA infection could lead to sepsis and death if not treated. She asked the chief deputy to accompany her as she physically examined Butler, but he declined and told her not to worry about it. Moss returned to the medical office where she wrote a short incident report at 5:40 p.m., placing Butler on 72-hour

---

[1]According to Shadrick, Butler also took Lortab, a controlled substance, for arthritis pain and Benicar for hypertension.

detoxification for suspected drug use and on medical watch due to his reported staph infection.**2** Moss admitted that she did not contact SHP's Medical Director for HCDC, Dr. Henry Davis, to request medical orders for Butler's care during the detoxification period.

SHP's "Intoxication and Withdrawal Policy" provided that "[d]etoxification will be carried out only under medical supervision *and initiated by the medical staff with physician overview on an individual care basis.*" R. 101-5 PageID 2037 (emphasis added); R. 84 PageID 1407–08, 1418. The policy further required consistent monitoring, documentation of all findings in the inmate's medical chart, and documentation of vital signs twice daily on an Alcohol and Drug Detox Flow Sheet. Anticipating the end of her shift, Moss expected that Andy Johnson, LPN, the nurse coming on duty, would take Butler's vital signs, start the Alcohol and Drug Detox Flow Sheet, and monitor Butler's condition. Moss told Johnson that she had not examined Butler. When Johnson started his shift, he did not examine Butler or record his vital signs on an Alcohol and Drug Detox Flow Sheet. He did not call Dr. Davis for orders to manage Butler's medical conditions or to insure continuity of prescription medications.

HCDC staff assigned Butler to cell 203, located across from the booking area. His bed consisted of a mat placed on a concrete slab three to four inches off the floor. Although HCDC staff placed Butler on suicide watch, there is no evidence that Butler was evaluated for suicidal ideation.

During Butler's short stay at HCDC, his blood pressure was taken once each day on April 9, 10, and 11 at unknown times, as shown on a "Blood Pressure Record Form" bearing the nurse initials "AJ." Nurse Andy Johnson did not recall ever touching Butler. Each reading showed a decrease in blood pressure, but there is no evidence that Butler received blood pressure medication during his confinement or that the nurses took steps to assess why his blood pressure was falling in the absence of medication. A "Medication Administration Record" indicates Butler received Allopurinol twice on April 9, Prednisone twice on April 9, and Quetiapine (Seroquel) once on April 9; however, SHP stated under oath in response to a discovery interrogatory that "Butler's medical record does not reflect that he was given any medications

---

**2**Apparently, the nursing shift report documented that Butler "'has a staph infection, no antibiotic—has not seen doctor—vomiting—rash all over body. Detox/Medical Watch x 72 hours.'" R. 101-3 PageID 2024. We have not located a copy of this report in the record.

during his incarceration beginning on April 8, 2010." R. 101-12 PageID 2051–52. Even if Butler received medication at HCDC, there is no evidence it was prescribed by Dr. Davis.**[3]**

None of the nurses who worked shifts during Butler's confinement at HCDC followed SHP's written policy guidelines for the treatment of staph and MRSA infections. Because these infections can progress rapidly, the policy instructs medical staff to: examine inmate skin infections carefully; monitor the patient and document all medical findings; report the infection to the HCDC Medical Director and obtain orders for proper antibiotic treatment; seek emergency hospital care if the inmate's condition worsens; notify jail staff to institute universal precautions to prevent spread of the infection; and report the infection to SHP's corporate headquarters. These steps were not taken after Butler reported his staph infection.

As medications were passed out to inmates late on Friday afternoon, April 9, Deputy Knox heard Butler tell Candace Moss through the food flap of his cell that he had a staph infection. Although Butler was still on detoxification and suicide watch, Moss did not medically assess Butler's condition. Moss later admitted that her failure to monitor Butler and chart his vital signs in the medical record violated written SHP policies.

At mid-afternoon on Saturday, April 10, Butler told Deputy Knox that he was too sick to be in jail. He asked for a sick-call slip, which Deputy Knox provided. Knox and Deputy Chambers discussed Butler's bloated appearance and gray pallor, and Knox tried to persuade the SHP nurse on duty to see Butler. The record contains no evidence that a nurse examined Butler at that time.

Later on Saturday afternoon, Sgt. Coy accompanied an unknown nurse as she handed out medications to inmates. When Butler stated that he was unable to get up from the floor and walk

---

**[3]**According to Shadrick, Butler suffered from many medical conditions, including an ongoing MRSA infection that required antibiotic treatments. During Butler's 2007 confinement at HCDC for ninety days, the staff refused to allow Butler to bring his prescription pain medication into the facility. The nursing staff asked Shadrick to refill her son's 30-day supplies of Allopurinol and Colchicine only once during the 90-day confinement period. During that same incarceration, Butler contacted his mother repeatedly to report that he was not receiving his medications and to ask for help. He told her that, without his medications, he became immobile and had vomiting and diarrhea. According to Shadrick, Butler pleaded, "Please help me. They're going to let me die." When Shadrick called the jail to ask why Butler was not receiving his medications, the nurse told her that medications were handed out to inmates twice each day, at 5:00 a.m. and 5:00 p.m. If the inmate did not walk to the cell door to receive his medications, the nurse passed the cell without giving the inmate the medication. R. 86 & 86-1 Page ID 1579–81, 1583, 1588.

to the cell door to receive his medication, Sgt. Coy and the nurse entered the cell to give Butler medication.  The nurse did not converse with Butler or medically assess his condition.  There is no written documentation that Butler actually received medication on Saturday.

Early Sunday morning, April 11, Deputy Brandon Lampton saw Butler sitting on the floor of his cell, leaning against the wall.  His elbows were red and swollen, and he was in obvious pain.  Lampton asked Butler if he was okay; Butler replied, "I'm fine."  A few minutes later, at 6:18 a.m., LPN nurse Renee Keller, SHP's only medical staff member on duty, cleared Butler from detoxification status early without examining or medically assessing his condition.  She wrote in the medical chart that Butler had to remain isolated due to staph infection.

As Deputy Lampton walked by the cell a few minutes later, Butler asked for a clean uniform because he had defecated on himself and he was in too much pain to move.  Butler's joints were swollen and hot to the touch.  Lampton immediately reported the situation to the shift commander.  Lampton and Deputy Stephen O'Reilly lifted Butler from the floor, placed him in a restraint chair, and pushed him to the shower.  There the deputies transferred Butler to a plastic chair and helped him remove his clothing so that he could shower.  Butler told them he was suffering from rheumatoid arthritis.  After the shower, the deputies helped Butler with toileting and dressing and returned him to his cell.

Lampton walked to the medical office to inform nurse Keller that Butler had been taken to the shower because he soiled his clothes.  Lampton asked Keller if she knew about Butler's swollen joints.  Keller said she was aware of Butler's situation and otherwise expressed no concern.  According to Lampton, deputy jailers commonly received similar responses from SHP medical staff.

Within an hour, Lampton learned that Butler had defecated again.  When Butler declined to take a second shower, Lampton handed him a clean uniform.  Because Butler's condition was now "a real issue," Lampton returned to the medical office, reported that Butler had diarrhea, and suggested that Butler should be moved to a segregation cell with a higher bunk so that he could rotate himself onto the toilet.  Keller showed no inclination to check on Butler.  Lampton informed his shift commander, Jeremy Witherspoon, that he was moving Butler to a segregation

cell with a bunk.  Lampton and Deputy Poe lifted Butler into the restraint chair and transferred him to the new cell.  Lampton had never seen an inmate with such limited mobility.

Keller's testimony differed from Lampton's.  She testified that she checked on Butler while he was showering and helped put his shirt on; that it was her idea to move Butler to a segregation cell with a bunk; and that she asked Butler if he needed anything and he told her he did not.  She did not check his vital signs, document her visit with him, or give him any medication.  She was not sure whether SHP's written policies required her to take any such steps.  She stated that it was customary for SHP medical staff to examine an inmate only if he submitted a sick call request.

On Sunday afternoon, HCDC deputies periodically checked on Butler, but the record includes no documentation of his medical status.  Deputies looked through the cell window only to confirm that he was breathing.  Between 3:30 and 4:00 p.m., Butler asked Deputy Kreitler for a drink of water because he could not get up.  She told him to get the water from his cell faucet.  Butler again asked for a cup of water.  Although Kreitler agreed to retrieve one, she never did so.  When she returned to the cell at 4:19 p.m., Butler was lying awkwardly on his bunk, unresponsive.  She entered the cell and shook him, but he did not respond.  He did not have a pulse and was cold to the touch.

Nurse Keller was called to the cell.  She found Butler cold, blue-gray in color, and without a pulse.  She did not begin CPR.  At 4:25 p.m., she paged Dr. Davis, who did not respond.  At 4:27 p.m., she called Emergency Medical Services.  The county coroner arrived shortly after 4:30 p.m. and pronounced Butler dead.  An autopsy disclosed that he died of a sudden cardiac arrhythmia due to sepsis, a complication of MRSA infection.  Significant co-existing conditions were obesity with hypertension, rheumatoid arthritis, and coronary atherosclerosis.

After Butler's death, Keller called her supervisor, Andrea Pleasant, SHP's medical team administrator and nurse manager for HCDC.  Pleasant had been out-of-town during most of Butler's incarceration.  Pleasant called her supervisor, SHP's regional administrator Betty Dawes, RN, to ask about completing necessary paperwork.  At Dawes's instruction, Pleasant went to the jail, faxed some papers to SHP headquarters, made sure Keller had tried to call the

doctor, and then left. Jailer Joe Blue contacted SHP President and Chief of Operations, Jennifer Hairsine, and asked her to come to HCDC to evaluate whether any changes should be made.[4]

On Monday, April 12, Hairsine and SHP Vice President of Operations, Lisa Watts, visited HCDC. They met with Jailer Blue for fifteen to twenty minutes. Blue summarized the recent events and reported the coroner's suspicion that Butler had MRSA infection. They did not discuss Dr. Davis or the county's contract with SHP. After talking with Blue, Hairsine and Watts spoke to Angela Pleasant and a nurse, but Hairsine did not think the nurse was Keller or Johnson. If Hairsine spoke to Moss, it was by telephone. Hairsine told Blue that "everything looks fine" and demonstrated no concern that SHP medical personnel had acted improperly. After a two-hour visit, Hairsine and Watts returned to Chattanooga, Tennessee. Hairsine did not know that Pleasant terminated Johnson's employment that day.[5]

Jailer Blue admitted that he had not read SHP's policies and procedures completely, but he and his employees relied on SHP nurses and the Medical Director to make all medical decisions concerning inmates. Blue acknowledged that, under Kentucky corrections policy, Butler was entitled to receive health care comparable to that available to free citizens in the surrounding community.

SHP is a privately-owned, for-profit Delaware corporation employing 800 workers, including more than 700 full- and part-time nurses. SHP maintains contracts with 198 jail facilities, thirty of which are located in Kentucky. Other facilities are located in Tennessee, Ohio, Mississippi, North Carolina, South Carolina, Pennsylvania, Texas, Virginia, and Wisconsin. The company currently does not provide medical services to inmates of HCDC.

SHP contracted with Dr. Davis to serve as Medical Director at HCDC, but he denied any responsibility for training or supervising SHP nurses. He characterized himself as a consultant

---

[4]The district court record includes only three pages of Hairsine's deposition. R. 76-2. SHP filed the entire deposition as an appendix to its appellate brief. No. 14-5603 R. 12. Because Shadrick did not object to the filing of the entire deposition, this opinion relies on portions of the deposition that may or may not have been available to the district court. The district court's opinion included citations to pages of Hairsine's deposition that were not included in the lower court record, but we cannot tell whether the full deposition was manually submitted to the district court without filing or whether the district court adopted citations to the deposition that appeared in the parties' briefs.

[5]Johnson testified that he was terminated for making a mistake in mailing an inmate drug screen sample and not for conduct relating to Butler's death.

who is available to answer questions. He denied providing any treatment protocols to SHP, although he probably did give some advice about administering insulin. He did not know that Butler was confined at HCDC until he learned of Butler's death.

LPN Candace Moss had never worked in a correctional facility before. She did not participate in any training program before reporting for work as a visiting nurse, and she could not recall if she ever received a copy of SHP's written policies and procedures. She did not remember signing a form acknowledging that she received the SHP policies and read them. On her first day of work at the Taylor County Jail, she received some on-the-job training from Betty Dawes, SHP's regional administrator in charge of several Kentucky jails. Moss had never met Dr. Davis or spoken to him by telephone. She did not receive an evaluation during the eighteen months she worked for SHP. After Butler's death, no one from SHP interviewed her about her interactions with Butler.

LPN Andy Johnson gave similar testimony. He did not attend an SHP training program before starting work, although he received limited on-the-job training during his first two days of employment, such as learning where supplies were kept. He did not recall ever seeing a copy of SHP's written policies and procedures.

LPN Renee Keller testified that SHP did not provide her with any training on the SHP policies or how she should perform her job. She recalled that Angela Pleasant conducted meetings approximately every other month to go over policy changes or to explain something the nurses were not doing correctly. She remembered being told to read the SHP policies and she signed a document confirming that she had done so, but she did not actually read all of the policies, and she could not discuss any specifics of them during her testimony. She did not know whether SHP policies required her to take Butler's vital signs or check on him while he was confined in segregation. No one from SHP supervised or critiqued her work or reviewed her medical progress notes to be sure that she was following SHP policies. A large part of her job involved referring to protocol books without consulting the doctor. After Butler's death, no one from SHP talked to her about Butler.

LPN Angela Pleasant testified that SHP did not require her to have a working knowledge of SHP's written policies and procedures even though she was SHP's medical administrator at

HCDC.  She consulted SHP's policies only if problems arose.  Although she was responsible for supervising other nurses, she could not recall the policies on MRSA infection, segregation, or alcohol and drug detoxification.  The nurses at HCDC followed an undocumented custom and practice of providing medical assistance only if an inmate asked for it or if there was an emergency.  If an inmate reported a staph infection and vomiting, Pleasant would advise him to put in a sick-call slip and ask for help.  If he did not do so within a few days, Pleasant would place him on suicide watch.  She reasoned that, if the inmate does not seek help, he must have suicidal ideations.  She would follow this course of conduct even though she knows that the inmate's MRSA infection could rapidly deteriorate into sepsis and spread to other inmates and staff in the jail.  After Butler died, SHP did not reprimand her or any other nurse for failing to follow any SHP policy.

Betty Dawes, an RN and SHP's regional administrator, visited HCDC once every two to three months for four hours or less and sometimes conducted audits.  During the visits, she talked to the Jailer and the nurses and reviewed some records.  She could not recall any issues that were raised during these visits.  Ordinarily, Dawes does not train new nurses, but she will provide training if it is needed.  She had never read HCDC's policies, but she expected Angela Pleasant to be familiar with them.  Dawes conceded that SHP nurses did not meet the standard of care in monitoring and treating Butler and that they failed to follow SHP policies on alcohol and drug detoxification, medical chart documentation, and treatment of MRSA infection.  She did not help investigate Butler's death or speak to Dr. Davis about it.  Approximately two weeks after Butler's death, Dawes paid a two-hour "support visit" to the jail.  No one had any questions for her and she did not ask to review Butler's medical file.  To her knowledge, Hairsine and Watts did not visit the jail after Butler's death.

According to President Hairsine, SHP bids a jail contract depending on what a county is willing to pay for nurses.  She believes that SHP nurses are trained by virtue of being licensed in Kentucky, and they might receive additional training from the medical team administrator, the regional administrator or the vice-president of operations, all of whom are nurses.  Hairsine does not know how RNs and LPNs differ in medical training or how their scope of practice differs except that she is aware LPNs cannot diagnose medical conditions.  SHP relies on the nurse to

inform the company of her scope of practice and to notify the company if she is operating outside that scope. On one or two occasions, SHP regional administrators notified Hairsine that their LPN nurses had engaged in conduct outside their scope of practice. Hairsine is also aware that SHP nurses sometimes follow a practice of documenting only medical abnormalities in inmate charts instead of maintaining consistent chart documentation.

Hairsine was fully involved in drafting SHP's policies and procedures, which are reviewed every six months. Hairsine stated that SHP nurses are required to read the policies and sign a document stating they have done so, but SHP allows the nurses to implement the written policies at their discretion.

Hairsine further testified, in contradiction to HCDC's written policy, that SHP nurses can only recommend to HCDC staff that an inmate should be admitted to the facility; the ultimate authority to make the admission decision lies with HCDC administrators, not SHP staff. In contrast to Dr. Davis's testimony, Hairsine stated that the Medical Director is responsible for supervising medical personnel at HCDC, including the medical team administrator, Pleasant. Hairsine spoke to Dr. Davis by telephone after Butler died. Although Dr. Davis expressed concern that he did not know Butler was housed at HCDC, Hairsine thought Dr. Davis did not possess any information suggesting that the SHP nurses should have called him about Butler.

Finally, Hairsine was unaware of any previous complaints about SHP staff who worked at HCDC. She conducts a file review after every reported inmate death, but usually she does not visit the jail facility where the death occurred.

After reviewing this and other evidence, Shadrick's medical expert, Madeleine LaMarre, opined that SHP failed to establish an adequate health care system to meet the serious medical needs of the inmate population at HCDC. In her opinion, all of the SHP nurses who had contact with Butler violated generally accepted standards of nursing practice and all of them exceeded the legal scope of their practice as LPNs licensed in Kentucky. LaMarre further opined that SHP failed to hire sufficient numbers of qualified medical professionals to work at HCDC, and because LPNs "are not licensed to make independent nursing assessments or nursing diagnoses, . . . the use of standing orders and treatment protocols by LPNs is not consistent with Kentucky nursing practice standards. Thus, LPNs should be directly supervised by a registered nurse or

physician." PageID 2032.  Because this was not the case at HCDC, LaMarre concluded that the SHP nurses practiced without sufficient clinical oversight.  She characterized the situation as illegal and dangerous, opining that the lack of training and supervision of LPN nurses directly contributed to Butler not receiving appropriate medical treatment, ultimately leading to his death.

LaMarre observed that this was not the first time Butler had been denied access to a qualified health care provider who could diagnose and treat his medical conditions.  She provided several examples of nurses making medical decisions beyond the scope of their practice during Butler's previous confinements at HCDC in 2007 and 2008.  Finally, LaMarre opined that SHP did not train the staff adequately on the health care policies and procedures or maintain a functioning quality improvement program to monitor compliance with SHP policies and procedures.

On this record, the district court granted summary judgment in favor of SHP, and Shadrick now appeals.  We have jurisdiction under 28 U.S.C. § 1291.

## II.  STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment.  *Cass v. City of Dayton*, 770 F.3d 368, 373 (6th Cir. 2014).  Summary judgment is appropriate if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact for trial.  Fed. R. Civ. P. 56(a); *Cass*, 770 F.3d at 373.

## III.  ANALYSIS

Shadrick seeks reversal on two grounds.  First, she contends there are genuine issues of material fact remaining for trial on her § 1983 claim against SHP for failure to train and supervise its LPN nurses.  She further argues that she produced sufficient proof to proceed against SHP on a theory of negligence and that SHP is not entitled to qualified official immunity on this claim under Kentucky state law.  We begin with the federal claim.

## A.  Failure to train and supervise

To prevail on a cause of action under § 1983, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting

under the color of state law." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks omitted). The second requirement is not in question. Our court has held that private corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983. *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014). The parties here, like those in *Arflack v. County of Henderson,* 412 F. App'x 829, 830 n.2 (6th Cir. 2011)—prior litigation involving SHP—do not dispute that SHP stands in the shoes of Hopkins County for purposes of § 1983 liability.

The constitutional right at issue arises from the Eighth Amendment's prohibition on cruel and unusual punishment because Butler was serving a criminal sentence at the time he died at HCDC. *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 133 (6th Cir. 2014). That Amendment barred SHP and its employees from unnecessarily and wantonly inflicting pain on Butler through deliberate indifference to his serious medical needs. *Id.* In the Supreme Court's words,

> elementary principles establish the government's obligation to provide medical care to those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the [Eighth] Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citation omitted).

The "deliberate indifference" standard of the Eighth Amendment governs SHP's responsibility for training and supervising its LPN nurses concerning their legal duty to honor an inmate's constitutional right to adequate medical care. SHP's failure to train and supervise its LPN nurses adequately "about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011), and constitute the moving force behind Butler's harm. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Shadrick's burden under § 1983 is to prove that SHP's failure to train and supervise its LPN nurses about the legal duty to provide constitutionally adequate medical care amounted "to deliberate indifference to the rights of persons with whom the [nurses] come into contact." *City of Canton*

*v. Harris*, 489 U.S. 378, 388 (1989). The law does not permit Shadrick to hold SHP liable under § 1983 on theories of vicarious liability or *respondeat superior*. *See Rouster*, 749 F.3d at 453.

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty.*, 520 U.S. at 410. The standard is comprised of both objective and subjective components. *Jones*, 625 F.3d at 941. The objective component is easily met in this case because Butler suffered from a variety of medical conditions demonstrating a "sufficiently serious" medical need for treatment and care. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Nearly all of his medical conditions had been diagnosed by his private physician as mandating treatment, and Butler's need for medical care while confined at HCDC was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jones*, 625 F.3d at 941 (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)). The deputy jailers could tell that Butler needed prompt medical treatment even though they did not have the same medical training as SHP's nurses.

The subjective element of deliberate indifference requires proof that SHP possessed a culpable state of mind in failing to train and supervise LPN nurses working within the jail environment. *Id.* Shadrick cannot meet this requirement by showing mere negligence, *Farmer*, 511 U.S. at 835, yet the bar is not so high that Shadrick must prove SHP's actual intent to cause harm, as our dissenting colleague suggests. Dissent at 36 ("Deliberate indifference, unlike negligence, requires intent.") The Supreme Court has defined deliberate indifference as "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other" and it is "routinely equated . . . with recklessness." *Farmer*, 511 U.S. at 836. Acting or failing to act "with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* "In other words, a plaintiff 'does not need to show that the [defendant] acted with the very purpose of causing harm or with knowledge that harm will result.'" *Bonner-Turner v. City of Ecorse*, No. 14-2337, 2015 WL 5332465, at *6 (6th Cir. Sept. 14, 2015) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 541 (6th Cir. 2008)). The standard satisfies the "twin goals" of being high enough not to equate to mere negligence, but

low enough so that a plaintiff can avoid summary judgment in favor of the defendant without having to prove her entire case. *Id.*

Shadrick can thus establish an Eighth Amendment violation if she can prove that SHP knew of and disregarded an excessive risk to inmates' health or safety; the proof must demonstrate that SHP was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed and that SHP drew the inference. *Farmer*, 511 U.S. at 837. More specifically, Shadrick must prove that SHP's training program and supervision were inadequate for the tasks the nurses were required to perform, the inadequacy resulted from SHP's deliberate indifference, and the inadequacy actually caused, or is closely related to, Butler's injury. *See Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).[6] The dissent is mistaken when it characterizes the issue as whether SHP "has . . . consciously adopted a specific 'policy' of perpetrating unconstitutional conduct," Dissent at 35; whether "SHP consciously decided to adopt a policy that it knew would cause its employees to violate inmates' constitutional rights," *id.* at 36; or whether "SHP consciously chose to violate inmates' constitutional rights," *id.* at 41. The central question is whether SHP's failure to train its nurses to adhere to their legal duty to honor the constitutional right of inmates to adequate medical care amounted to SHP's deliberate indifference to the rights of inmates like Butler with whom SHP and its staff come into contact. *See City of Canton*, 489 U.S. at 388.

Our analysis focuses on the adequacy of SHP's *training program*, *see id.* at 390, which is "necessarily intended to apply over time to multiple employees." *Bryan Cnty.*, 520 U.S. at 407. Shadrick cannot meet her burden of proof by showing that one nurse was unsatisfactorily trained, that "an otherwise sound" training program was "negligently administered," or that harm could have been avoided if the nurse had had "better or more training, sufficient to equip [her] to avoid

---

[6]Shadrick cites *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995), as support for her argument that SHP failed to supervise its employees. Appellant's Br. at 32. *Taylor* concerned a claim of failure to supervise brought against a specific jail official sued in his individual capacity. *Id.* In that situation, a plaintiff must show that the supervisor at least implicitly authorized, approved, or knowingly acquiesced in unconstitutional conduct of a subordinate. *Id.* *Taylor* has no application here because Shadrick contends that SHP, a corporate entity acting under contract with Hopkins County, maintained a policy or custom of failing to train and supervise its nurses. *See Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355–56 (6th Cir. 2013) (distinguishing between individual-capacity and official-capacity failure-to-train or supervise claims).

the particular injury-causing conduct." *See City of Canton*, 489 U.S. at 390–91. Instead, Shadrick can demonstrate SHP's failure to provide LPN nurses with adequate training and supervision in one of two ways. She can show "[a] pattern of similar constitutional violations by untrained employees" and SHP's "'continued adherence to an approach that [it] knows or should know has failed to prevent tortious conduct by employees," thus establishing "the conscious disregard for the consequences of [its] action—the 'deliberate indifference'—necessary to trigger municipal liability." *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cnty.*, 520 U.S. at 407). Alternatively, Shadrick can establish "a single violation of federal rights, accompanied by a showing that [SHP] has failed to train its employees to handle recurring situations presenting an obvious potential" for a constitutional violation. *Bryan Cnty.*, 520 U.S. at 409. This second mode of proof is available "in a narrow range of circumstances" where a federal rights violation "may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Id.* In such a case,

> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 390. As an example, "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons." *Id.* at 390 n.10. Having armed the police officers with guns to accomplish the task, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (internal citation omitted). This method of proof does not require Shadrick to show that SHP had actual or constructive notice that its nurses were deficiently trained, as asserted in the dissent; proof of actual or constructive notice is necessary only when a plaintiff pursues § 1983 liability on the pattern theory of constitutional violations. *See Connick*, 131 S. Ct. at 1360–61.

The likelihood that a particular situation will recur and the probability that an employee who lacks proper tools to respond to the situation will violate a citizen's federal rights could lead

to a finding that the policymaker's decision not to train reflects deliberate indifference "to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." *Bryan Cnty.*, 520 U.S. at 409. "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Id.* at 409–10.

When we apply these principles and examine the facts in the light most favorable to Shadrick, as we must in reviewing a motion for summary judgment, *Cass*, 770 F.3d at 373, the record reveals genuine issues of material fact that precluded a grant of summary judgment. SHP chose by contract to assume the county's constitutional medical obligations to its prisoners. SHP's administrators knew that the LPN nurses interacted with dozens of inmates presenting a wide and recurring range of medical conditions that required timely and accurate diagnosis and treatment. As we explain more fully below, a reasonable jury could find that the potential risk of the commission of constitutional torts by LPN nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting is so obvious that SHP's failure to provide adequate training and supervision to those nurses constitutes deliberate indifference to the risk. *See Farmer*, 511 U.S. at 836; *City of Canton*, 489 U.S. at 390.

### 1. The training program and supervision were inadequate

The evidence reveals that SHP did not have a training program. *See Campbell*, 700 F.3d at 794. There is no indication in the record before us that SHP designed and implemented any type of ongoing training program for its LPN nurses. While the nurses may have received some limited on-the-job training when beginning their employment, such as learning where supplies were kept, there is no proof of a training program that was designed to guide LPN nurses in assessing and documenting medical conditions of inmates, obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations.

LPN nurses complete a level of medical training, they obtain a Kentucky license, and they arrive on the job with a limited set of medical skills. This § 1983 claim does not turn, as the dissent says, on whether the nurses know how to make "rudimentary medical judgments" about

inmates' symptoms or whether they know when to call the doctor. Dissent at 39. Shadrick's expert witness established that LPN nurses lack any authority to diagnose medical conditions, yet the nurses are routinely confronted with frequent and competing demands for medical care arising from the needs of numerous inmates suffering from maladies of varying severity. It is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates. A reasonable jury, therefore, could determine that SHP's failure to train and supervise its LPN nurses in meeting their constitutional obligations demonstrates SHP's own deliberate indifference to the highly predictable consequence that an LPN nurse will commit a constitutional violation. *See Bryan Cnty.*, 520 U.S. at 409. A jury could find that "the unconstitutional consequences of failing to train" are "so patently obvious" that SHP should be held "liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 131 S. Ct. at 1361. Even the dissent acknowledges that *City of Canton* applies if "the need is so patent as to be self-evident." Dissent at 39.

The lack of training and supervision by SHP is clearly evidenced by the blanket inability of the LPN nurses who worked at HCDC to identify and discuss the requirements of SHP's written policies governing their work. *See Russo*, 953 F.2d at 1046 (noting police officers were unable "to give specific responses as to the content of their training.") The nurses professed ignorance of the written medical treatment protocols and policies purportedly drafted by SHP to guide their conduct. The nurses denied receiving ongoing training about their medical responsibilities within the jail setting, and they disclosed that their superiors did not give feedback or regular evaluations to let them know whether they performed appropriately. A genuine issue of material fact exists about whether SHP required the nurses to sign documents attesting that they had read and understood the SHP policies and protocols. Most troubling is the admission of Angela Pleasant, SHP's on-site nursing manager at HCDC, that she was not familiar with the SHP policies she was specifically designated to enforce. Key here also is her open acknowledgement that SHP nurses followed an undocumented policy and custom of providing medical assistance only if an inmate asked for it, despite the existence of written policies, procedures, and treatment protocols mandating that nurses take particular actions at particular times.

Two high-level supervisors disclaimed any responsibility for training and supervising the LPN nurses. Dr. Davis denied that it was his job to train or supervise them, and Betty Dawes, SHP's regional administrator, conceded that she did not offer any type of training program or insure that the nurses were trained to carry out their responsibilities. Further, because she never compared the SHP policies to the jail policies to find any conflicts within them, she made no effort to clarify the proper course of conduct for nurses in instances of policy conflict.

Shadrick traced the lack of adequate training and supervision to the top of SHP's organization. President Hairsine is not college-educated or medically trained, and she could not explain the differences in the permitted scope of medical practice for LPNs and RNs. Rather than provide training and supervision necessary to insure that LPN nurses acted within the scope of practice, SHP expected the nurses to define that scope for the company. Hairsine pointed to the SHP policies and treatment protocols as proof of instruction, yet she candidly admitted that SHP allowed LPN nurses to use the policies and protocols in their discretion, even though a critical document like the MRSA policy mandated immediate implementation of a specialized treatment protocol. Shadrick's expert witness opined that SHP failed to provide adequate training and supervision to the LPN nurses. *See Russo*, 953 F.2d at 1047 ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of . . . training procedures.")

Taking this evidence in a light most favorable to Shadrick, *see Cass*, 770 F.3d at 373, a reasonable jury could find that SHP was deliberately indifferent to the need to train and supervise its LPN nurses to provide adequate medical care to inmates, especially in view of the obvious risk that the Constitution could be violated without such training and supervision. *See City of Canton*, 489 U.S. at 390. As the party moving for summary judgment, SHP did not satisfy its initial burden to show the lack of genuine issues of material fact in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and Shadrick, the non-moving party, produced sufficient evidence "on which the jury could reasonably find" that SHP inadequately trained and supervised its LPN nurses, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Plinton*, 540 F.3d at 464 (observing plaintiff demonstrated a genuine issue of material fact on the

"inadequacy-of-training prong of *City of Canton*); *Russo*, 953 F.2d at 1047. On this record, the grant of summary judgment to SHP was inappropriate.

Neither the Supreme Court's decision in *Connick* nor this court's decision in *D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014), compel a different result. Both *Connick* and *D'Ambrosio* involved § 1983 claims brought against prosecutors who failed to turn over exculpatory evidence to defendants as required by *Brady v. Maryland*, 373 U.S. 83 (1963). *Connick*, 131 S. Ct. at 1355–56; *D'Ambrosio*, 747 F.3d at 382. In *Connick*, the Supreme Court recognized that *City of Canton* "left open the possibility" that "a pattern of similar constitutional violations might not be necessary to show deliberate indifference," but concluded that a district attorney's failure to train his prosecutors "in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability." *Connick*, 131 S. Ct. at 1361. The Court reasoned that "[a]ttorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." *Id.* By contrast, there was "no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training." *Id.* The Court offered further contrast by noting that the *City of Canton* "hypothetical assume[d] that the armed police officers ha[d] no knowledge at all of the constitutional limits on the use of deadly force," while in *Connick* it was undisputed "that the prosecutors . . . were familiar with the general *Brady* rule." *Id.* at 1363. *See also D'Ambrosio*, 747 F.3d at 386–89 (following *Connick* to affirm dismissal of § 1983 complaint brought by exonerated death row inmate against prosecutor who violated *Brady* obligations).

This case mirrors the example given in *City of Canton*. The obvious need to train police officers who lack knowledge of the constitutional constraints on the use of deadly force parallels the obvious need to train LPN nurses who lack knowledge about the constitutional dimensions of providing adequate medical care to inmates in the jail setting. Unlike licensed prosecutors who completed law school, routinely attend ongoing continuing legal education classes, receive on-the-job legal mentoring, and labor under rules of professional responsibility to master their *Brady*

obligations, *Connick*, 131 S. Ct. at 1361–62, LPN nurses employed within the prison environment may be required to make professional judgments outside their area of medical expertise. Unless the employer provides necessary training, the LPN nurses lack knowledge about the constitutional consequences of their actions or inaction in providing medical care to inmates. Because it is so highly predictable that a poorly trained LPN nurse working in the jail setting "utter[ly] lack[s] an ability to cope with constitutional situations," *id.* at 1363, a jury reasonably could find that SHP's failure to train reflects "deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights," *id.* at 1361 (quoting *Bryan Cnty.*, 520 U.S. at 409). Unlike *Connick* and *D'Ambrosio*, this case falls squarely within "the narrow range of *Canton*'s hypothesized single-incident liability." *Connick*, 131 S. Ct. at 1361.

## 2. *The inadequacy of training resulted from SHP's deliberate indifference*

Shadrick's evidence demonstrates that SHP's inadequate training and supervision of its LPN nurses resulted from its own deliberate indifference to the rights of inmates with whom the nurses came into contact. *See id.* at 1360; *City of Canton*, 489 U.S. at 388. As we explained above, none of the administrators within SHP's organizational hierarchy—President Hairsine, Regional Administrator Dawes, Nurse Manager Pleasant, or the Medical Director, Dr. Davis— took responsibility to train LPN nurses at HCDC or to provide them with appropriate supervisory oversight to avoid violation of the constitutional rights of confined inmates to adequate medical treatment for their serious medical needs. *See City of Canton*, 489 U.S. at 388. President Hairsine's failure to enforce SHP policies and treatment protocols produced LPN nurses who were ignorant of the constitutional standards governing their medical practice in the jail setting. As a result, the nurses engaged in a custom and practice of requiring seriously ill inmates to request medical care before any services would be provided, even if the circumstances called for emergency medical treatment.

Evidence concerning the conduct of SHP after Butler's death further confirms the company's deliberate indifference. When Jailer Blue called President Hairsine to HCDC after Butler's death, she visited for less than two hours and pronounced "everything was fine." There is no proof that Hairsine, Watts, Dawes, Pleasant, or any other SHP manager investigated whether Butler's death was related to the adequacy of medical care SHP nurses provided or

failed to provide.  Nurses Keller and Johnson both testified that no one from SHP contacted them about Butler's death.  Nurse Pleasant stated that neither she nor any other staff member was counseled or disciplined by an SHP administrator following Butler's death.  RN Dawes conceded that the LPN nurses assigned to HCDC did not follow SHP's policies and procedures in caring for Butler, that the nurses failed to meet the medical standard of care, and that the nurses failed to follow documentation guidelines.  But Dawes made no attempt to train the nurses before or after Butler died, and she offered only a belated "support visit" to the staff following Butler's death.  In the opinion of Shadrick's expert witness, SHP's business model by its nature creates substantial deficiencies in the provision of adequate health care services to inmates.

The conduct of SHP staff both before and after Butler's death is relevant to whether SHP's failure to train and supervise its LPN nurses reflected a deliberate or conscious choice for which SHP may be held liable under § 1983.  *See City of Canton*, 489 U.S. at 389.  Because the decisions of President Hairsine represent SHP's official policy, moreover, a jury could find that her deliberate indifference is equivalent to SHP's deliberate indifference.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 483–84 (1986).

There is simply no evidence in this record that SHP took any steps to train and supervise its LPN nurses concerning the constitutional dimensions of care in a prison environment.  Because a jury reasonably could find that the inadequacy in the training program resulted directly from SHP's deliberate indifference, SHP is not entitled to summary judgment on this element of the claim.

### 3. *The inadequacy in training actually caused, or is closely related to, Butler's injury*

Reasonable jurors could further determine that SHP's inadequate training and supervision actually caused, or was closely related to, Butler's injury and death.  *See Plinton*, 540 F.3d at 464.  Butler was a sick man when he reported for admission to HCDC.  The deputy jailers did not want to admit him, but they deferred to Candace Moss, SHP's visiting LPN, who was the only medical staff person on duty and the only one with authority to decide whether to admit Butler to the jail.  Moss admitted Butler to the jail without conducting a medical examination and did not call Dr. Davis for treatment orders.  Nurses Johnson, Moss, and Keller each failed to assess Butler's medical condition and seek physician orders during the following 72 hours.  At

best, the evidence shows that Butler received three blood pressure checks and five prescription tablets, none of which constituted necessary and prompt treatment for the staph or MRSA infection that ultimately led to sepsis and Butler's death. Grossly inadequate medical care may establish deliberate indifference. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).

The undisputed facts establish that Butler's urgent need for medical treatment was apparent the moment he walked through HCDC's door, yet SHP staff did not provide it in spite of Butler's requests for help and the urging of jail deputies to attend to Butler. Not only were the SHP nurses aware of facts alerting them that Butler faced a substantial risk of serious harm if he did not receive timely and proper medical care, there is evidence they actually drew the inference of a substantial risk of serious harm and recklessly disregarded it. *See Farmer*, 511 U.S. at 835 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.") The lack of evidence that SHP trained and supervised its nurses in their constitutional obligations to provide medical care could lead a reasonable jury to find that SHP was deliberately indifferent to the inmates with whom the nurses came into contact and that SHP's failure to train and supervise the nurses actually caused, or was closely related to, Butler's death. *See Plinton*, 540 F.3d at 464.

Shadrick produced sufficient evidence to create genuine issues of material fact for trial on all three elements of her § 1983 claim against SHP for failure to train and supervise the LPN nurses. She met SHP's summary judgment motion with evidence that SHP's training program is inadequate for the tasks the LPN nurses are required to perform, that the inadequacy resulted from SHP's deliberate indifference, and that the inadequacy actually caused, or was closely related to, Butler's injury. Summary judgment on the § 1983 claim was unwarranted, thus requiring us to reverse and remand the case for further proceedings on this claim.

Although we do not address Shadrick's argument that a pattern of tortious or unconstitutional conduct by inadequately trained nurses existed, *see Bryan Cnty.*, 520 U.S. at 407–08; *Burgess*, 735 F.3d at 478, evidence about similar incidents of inmate deaths in jail facilities served by SHP may be relevant to whether SHP acted with deliberate indifference to the medical needs of inmates with whom its nurses came into contact at HCDC. This is a trial

issue for the district court to resolve on remand. We do not address Shadrick's contention that SHP management ratified the conduct of its nurses.

**B. Negligence and immunity under Kentucky law**

Shadrick next challenges the district court's ruling that SHP is protected by qualified official immunity from the negligence claim brought against it. Because qualified official immunity does not apply to SHP, a corporate entity, and because SHP is not entitled to governmental immunity as the agent or alter ego of Hopkins County, we reverse the grant of summary judgment in favor of SHP on the negligence claim.

Sovereign immunity has long protected the Commonwealth of Kentucky from suit, *Comair, Inc. v. Lexington-Fayette Urban Cnty Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009), and "[c]ounties, which predate the existence of the state and are considered direct political subdivisions of it, enjoy the same sovereign immunity as the state itself. *Id.*; *Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004); *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 163 (Ky. 2003). State or county agencies, however, are protected only by governmental immunity, "a policy-derived offshoot of sovereign immunity." *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 801 (Ky. 2009); *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001). Under the doctrine of governmental immunity, a state or county agency or entity is immune from tort liability if it performs "a governmental, as opposed to a proprietary, function." *Yanero*, 65 S.W.3d at 519.

In providing medical services to incarcerated inmates, SHP claims to act as an arm, agent, or alter ego of Hopkins County. To determine whether SHP is entitled to share the county's governmental immunity, we apply the test announced by the Kentucky Supreme Court in *Comair*: The immunity inquiry turns on the source of the entity and "the nature of the function it carries out." *Comair, Inc.*, 295 S.W.3d at 99; *Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015). The origin of the entity—whether it was created by the state, the county, or a city—is important because the entity's immunity status depends to some extent on whether the parent entity is immune. *Comair, Inc.*, 295 S.W.3d at 99. The second part of the test—the nature of the function carried out—must focus "on state level governmental concerns that are common to all of the citizens" of the state, such as the corrections system. *Id.*

When we apply both components of the *Comair* test, we conclude that SHP is not entitled to share the county's governmental immunity. Although SHP performed a governmental function in providing medical care to county inmates, SHP cannot demonstrate that its origin derived from Hopkins County. In response to SHP's manifest inability to meet the origin requirement, the dissent blends the first part of the *Comair* test into the second, rendering the origin requirement superfluous. Dissent at 44 ("But if the *source* and nature *of the function* is otherwise clear . . . there is no need to retrace the entity's genesis") (emphasis added). But the Kentucky Supreme Court instructs us to analyze both parts of the *Comair* test and we do so here.

SHP clearly satisfies the second part of the *Comair* test because SHP, by contract, was charged with performing Hopkins County's traditional governmental function of providing medical services to inmates held at HCDC, which is part of a larger state-wide corrections system. Hopkins County is required by state statute to "prescribe rules for the government, security, safety, and cleanliness of the jail and the comfort and treatment of prisoners," and it must also bear the costs of "providing necessary medical, dental, and psychological care for indigent prisoners in the jail." Ky. Rev. Stat. Ann. § 441.045(1) & (3) (West 2015). Kentucky administrative regulations, however, do not place the burden to provide direct inmate medical care on the counties themselves. Instead, "[t]he jail's medical services *shall be provided by contracting with a health care provider* licensed in Kentucky." 501 Ky. Admin. Regs. 3:090 (2015) (emphasis added). In conformity with this state regulation, Hopkins County contracted with SHP to provide necessary medical services to inmates incarcerated at HCDC. Hopkins County retained no control over the manner or means by which SHP provided the contracted medical services because the regulation explicitly states that the county's Jailer may not restrict the health care staff in the performance of medical duties except to require the medical staff to adhere to the jail's security requirements. *Id.* All medical procedures are required to be performed "according to orders issued by the responsible medical authority." *Id.* Because SHP fulfilled a governmental function of providing medical care to inmates by contract with Hopkins County, the second part of the *Comair* test is satisfied.

SHP, however, cannot meet the first part of the *Comair* test, which focuses on the origin of the entity claiming to be an arm, agent, or alter ego of a county in order to share in its

immunity.  *Comair, Inc.*, 295 S.W.3d at 99.  Hopkins County did not create SHP as a governmental agency, nor did it designate SHP as the county's agent or alter ego.  Instead, private individuals formed SHP as a for-profit corporation under Delaware law.  SHP is managed by a private corporate hierarchy and exists to provide medical services to dozens of prison facilities in multiple jurisdictions.

Hopkins County did not exercise control over SHP because at all times SHP conducted itself as an independent contractor of the county.  This is expressly addressed in the parties' written agreement.  In Section 9.1 of the contract, the parties created the boundaries of their business relationship:  "The parties acknowledge that SHP is an independent contractor engaged to provide medical care to inmates at the Jail under the direction of SHP management.  *Nothing in this Agreement is intended nor shall be construed to create an agency relationship*, an employer/employee relationship, or a joint venture relationship between the parties."  R. 77-26, Page ID 1309 (emphasis added).  In addition, SHP agreed in section 8.3 "to indemnify and hold harmless the County, its agents, servants and employees from any and all claims, actions, lawsuits, damages, judgments or liabilities of any kind whatsoever arising out of the operation and maintenance of the aforesaid program of health care services conducted by SHP, it being the express understanding of the parties hereto that SHP shall provide the actual health care services."  *Id.*

SHP thus contracted to perform a governmental function, but it may not partake of the county's sovereign immunity because it did not derive its existence and status from Hopkins County.  *See Comair*, 295 S.W.3d at 99.  Having failed to satisfy both components of the *Comair* test, SHP is not entitled to governmental immunity.  *Id.*  *See also Coppage Constr. Co.*, 459 S.W.3d at 860–64 (denying immunity to a sanitation district formed by communities in northern Kentucky because the district was not an arm or alter ego of the counties exercising substantial control over the district nor did it perform a function critical to Kentucky's infrastructure); *Transit Auth. of River City v. Bibelhauser*, 432 S.W.3d 171, 174 (Ky. Ct. App. 2013) (holding transportation entity met first prong of *Comair* test, but failed to show it carried out a function integral to state government).

A recent case decided by the Court of Appeals of Kentucky analyzing and applying the *Comair* test supports our analysis. *Kentucky River Foothills Dev. Council, Inc. v. Phirman*, No. 2013-CA-001858, 2015 WL 1746483 (Ky. Ct. App. April 17, 2015). We review the case in some detail because its reasoning is instructive here.

Kentucky River Foothills Development Council was incorporated under Kentucky law as a private nonprofit corporation in 1962. *Id.* at *1. Kentucky River was designated under federal law to serve as a community action agency to combat poverty in four Kentucky counties. *Id.* at *1–2. Congress later repealed statutes governing community action agencies and established the Community Services Block Grant Program, which transferred responsibility for running the program from the federal government to the states. *Id.* at *3. The federal government issued block grants to the states and charged the states with distributing the funds to eligible entities. *Id.* In response, Kentucky enacted a set of statutes to govern the establishment and administration of community action agencies. *Id.* at *3–4. Political subdivisions of the Commonwealth could designate themselves as community action agencies or designate eligible private nonprofit corporations as the community action agencies. *Id.* at *4. The day-to-day activities of a community action agency were not regulated by statute, and the agency was not limited to administering programs funded solely from state and federal grants. *Id.* at *5. The state, however, exercised substantial administrative oversight of the community action agency by monitoring and evaluating its compliance with state and federal statutes and administrative regulations. *Id.*

Applying the *Comair* test, the Court of Appeals agreed with Kentucky River "that providing services to the poor at the county level has historically been treated as an integral government function," but determined that alone was insufficient to cloak Kentucky River with governmental immunity. *Id.* at *6–7. Numerous factors impact the pertinent analysis:

> As recognized in *Caneyville*, while Kentucky places the most weight on the governmental function element, other factors should also be considered in particularly close cases. These could include: (1) whether state statutes and case law tend to characterize the entity as an arm of the state; (2) whether state resources may be required in satisfying adverse judgments against the entity; (3) whether the state has a financial or otherwise relevant beneficial interest in litigation affecting the entity; (4) how the entity is funded; (5) its level of autonomy; (6) whether the entity deals with primarily local or statewide

problems; (7) how state law/courts treat the entity; (8) the ability of the entity to sue and be sued in its own name; (9) whether the entity holds and uses property; (10) whether the entity can take or sell property; (11) the independent management authority of the entity; (12) whether the entity performs governmental or proprietary functions; (13) the entity's corporate status; and (14) whether the entity's property is subject to state taxation.

*Id.* at *7. The existence of these many factors "is why it is particularly important to consider the first prong of the *Comair* test, whether the entity was established by the government, in tandem with the governmental function prong." *Id.* Careful examination of how the entity was created and whether it is the offspring of a parental entity immune from suit will necessarily require consideration of the *Caneyville* factors, "such as how the state statute characterizes the entity, the extent by which the state controls the entity and its property, and whether, and to what extent, the entity functions apart from the state." *Id.*

The Court of Appeals concluded that Kentucky River "was not created by or at the behest of the state or any county of the state." *Id.* Instead, Kentucky River is a nonprofit corporation, formed by private citizens, which maintains an existence and administers programs independently of the Commonwealth or its counties. *Id.* Designation of Kentucky River as a community action agency "did not vest the Commonwealth with any interest in Kentucky River's real or personal property"; "the Commonwealth did not take control of Kentucky River's day-to-day operations or have direct oversight in the administration of programs funded separate[ly] from the block grants"; and "Kentucky River remained free to serve other interests outside the scope of its designation as a community action agency." *Id.* at *9. The Court of Appeals rejected Kentucky River's argument that the county's decision to designate it as a community action agency "transformed Kentucky River into a government created agency." *Id.* at *8. Designation of status as a community action agency did not mean that the nonprofit organization became "a creature of the state or the county"; rather, the organization continued to operate independently as a nonprofit corporation outside the scope of any state and county oversight connected to its designation as a community action agency. *Id.* The court distinguished Kentucky River's situation from that in *Autry v. Western Kentucky University*, 219 S.W.3d 713, 718 (Ky. 2007), where a state university formed a nonprofit entity for a specific

and limited purpose, the nonprofit corporation existed only to serve the university, and the nonprofit corporation derived its immunity status through the university. *Id.*

At bottom, the Court of Appeals concluded, "[t]he receipt of money from the government to further a cause important to government should not transform an otherwise private entity into a governmentally immune agency." *Id.* at *9. "A line must be drawn somewhere before the concept of governmental immunity is expanded far beyond any reasonable parameter." *Id.* Although in *Kentucky River* the Court of Appeals denied governmental immunity to a private, nonprofit corporation, its reasoning applies equally to private, for-profit corporations.

Like Kentucky River, SHP "was not established by the government for its benefit." *See id.* SHP was not even subject to the same level of governmental control and oversight that Kentucky River experienced. SHP was established as a private for-profit corporation long before Hopkins County designated it as an independent contractor to provide medical services to inmates housed at HCDC. *See id.* State statutes do not characterize SHP as an arm of the state and neither does Kentucky case law. In a recent whistleblower suit brought against SHP by some of its employees, the Court of Appeals held that SHP was not a political subdivision of the state because there was little evidence that Campbell County had any control over the specific, day-to-day aspects of SHP's work providing medical services to inmates. *See White v. Southern Health Partners, Inc.*, Nos. 2012-CA-001092, 2012-CA-001106, 2013 WL 2659897 (Ky. Ct. App. June 14, 2013) (unpublished). As in *White*, SHP here retained full autonomy to decide the nature and extent of medical services to be supplied to Hopkins County inmates. The contract between Hopkins County and SHP expressly provided that no county resources would be required to satisfy adverse judgments for tort liability because SHP agreed to indemnify Hopkins County. SHP maintains independent management and funds itself through profit-making enterprise extending beyond its relationship with Hopkins County. The company holds and disposes of its own property and retains the ability to sue and be sued in its own name. SHP continues to exist as a for-profit corporation long after its contract with Hopkins County ended. *See Kentucky River Foothills Dev. Council*, 2015 WL 1746483 at *7.

Like Kentucky River, SHP is not entitled to governmental immunity. *See id.* at *10. "The independent contractor . . . is no sovereign, and the protection of sovereignty should no

longer be extended to him, since, in the light of our changed views as to public policy, the public should not take the advantage of getting its work done cheaply by shifting the burden of sustaining the damage caused by negligent prosecution of that work by an independent contractor upon the injured individual." *Taylor v. Westerfield*, 26 S.W.2d 557, 559 (Ky. Ct. App. 1930).

Other courts have likewise declined to extend immunity to private, for-profit corporations charged with providing medical services under contracts with governmental entities. For example, a federal district court in Mississippi ruled that Wexford Health Sources, Inc., a for-profit Florida corporation operating as an independent contractor to provide health care to inmates in Mississippi prisons, was not entitled to tort immunity despite the degree of control exercised over Wexford by the Mississippi Department of Corrections. *Estate of Cheney ex rel. Cheney v. Collier*, No. 4:02cv111, 2012 WL 2403486, at *2–8 (N.D. Miss. June 25, 2012). Applying many of the same factors as *Kentucky River*, the district court held that Wexford did not operate as a political subdivision of the state and was not entitled to share its immunity. *Id.* at *6–8. In a state case answering a certified question from a federal district court, the Oklahoma Supreme Court ruled that a private corporation providing emergency medical services under a contract with a public trust established for that purpose is not entitled to governmental immunity for negligent acts. *Sullins v. Am. Med. Response of Oklahoma, Inc.*, 23 P.3d 259, 264 (Okla. 2001). These cases, although not controlling in our court, nonetheless support our analysis.

The district court below erred by extending qualified official immunity to SHP. Qualified official immunity protects *individual* public officials or employees who are sued in tort for their good-faith discretionary acts undertaken within the scope of their employment. *Jones v. Cross*, 260 S.W.3d 343, 345 & n.1 (Ky. 2008); *Yanero*, 65 S.W.3d at 521; *Rivera v. Lankford*, Nos. 2012-CA-2057, 2058, 2059, 2097, 2123, 2162, 2216, 2217, 2014 WL 2536914, *8–9 (Ky. Ct. App. June 6, 2014); *Jerauld v. Kroger*, 353 S.W.3d 636, 639–40 (Ky. Ct. App. 2011). Qualified official immunity should not be confused with governmental immunity, which applies to government agencies and entities, not to individuals. *See Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 305 n.1 (Ky. 2014); *Caneyville Volunteer Fire Dep't*, 286 S.W.3d at 801; *Kentucky River Foothills Dev. Council*, 2015 WL 1746483, at *2. Because SHP is a corporate entity sued in its

official capacity, only governmental immunity could possibly apply, and we have already explained why SHP is not entitled to governmental immunity.

The dissent desires to extend qualified official immunity to SHP by applying *Jerauld*, 353 S.W.3d 636, a case involving a negligence claim brought against a psychologist in his individual capacity. Following that path would obliterate the distinction between governmental immunity and qualified official immunity that the Kentucky appellate courts have fully articulated in their cases. Litigants and courts would be disserved by sowing seeds of confusion in this complex field of state immunity law that has "vexed the courts of the Commonwealth for decades." *Coppage Constr. Co.*, 459 S.W.3d at 859. In *Coppage*, *Comair*, *Caneyville*, *Furtula*, *Jones*, and *Yanero*, the Kentucky Supreme Court has provided guidance for distinguishing among the various types of immunity and to aid resolution of difficult questions of state immunity law. We are not free to disregard or rewrite Kentucky law, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938); instead, we are bound to follow the immunity precepts defined by the Kentucky courts in their interpretation of their own state law. *See Felder v. Casey*, 487 U.S. 131, 151 (1988) ("federal courts are constitutionally obligated to apply state law to state claims"). Furthermore, extending immunity to SHP as the county's agent responsible for providing medical care to inmates, as the dissent proposes, would impair the parties' written contract declaring that "[n]othing in this Agreement is intended nor shall be construed to create an agency relationship." R. 77-26, Page ID 1309.

Finally, SHP and the dissent rely on *Autry v. Western Kentucky University*, but that case is readily distinguishable for the reasons set forth by the Court of Appeals of Kentucky in *Kentucky River*, 2015 WL 1746483, at *8. Western Kentucky University, a state agency, created the non-profit Student Life Foundation (SLF) to hold title to dormitory properties. *Autry*, 219 S.W.3d at 718. The university transferred title to SLF, which in turn entered into a management agreement with the university providing that the university would operate the dormitories, collect rent, and hire and supervise staff. *Id.* A wrongful death action was brought against the university, SLF, and several individual defendants in their official and individual capacities. *Id.* at 716. The Kentucky Supreme Court concluded that the university was fulfilling its statutory duty by managing the dorms and was entitled to governmental immunity. *Id.* at 718.

SLF, formed by the university for a specific and limited purpose, existed only to serve the university's needs and acted as its alter ego. *Id.* at 718–19. Because "SLF has no truly independent existence from" the university, delegating dorm management to the university was "tantamount to [the university] delegating to itself." *Id.* at 719. Therefore, SLF shared the immunity of the state agency, the university. *Id.*

In this case, by contrast, Hopkins County did not create SHP, nor was SHP the alter ego of Hopkins County, nor did SHP exist solely to serve Hopkins County. As the Kentucky Court of Appeals did in *Kentucky River*, we distinguish *Autry* on this basis.

We acknowledge a troublesome paragraph at the end of *Autry* which notes that "SLF was sued directly, on the assumption that it is not a governmental entity at all. This amounts to suing SLF in its individual capacity. In that capacity, SLF is entitled to qualified official immunity, depending upon whether its delegation of management . . . was a discretionary or a ministerial function." *Id.* The opinion then relies on *Yanero*, a case applying qualified official immunity to individual persons, to support a statement that SLF engaged in discretionary acts and was entitled to qualified official immunity in its individual capacity. *Id.*

We think this paragraph is dicta and incorrectly applies to a corporate entity the concept of qualified official immunity that is meant to protect individual persons from suit in their individual capacities, thereby blurring a distinction in immunity law that Kentucky courts ordinarily draw with precision. *See e.g.*, *Furtula*, 438 S.W.3d at 305 n.1; *Caneyville Volunteer Fire Dep't*, 286 S.W.3d at 801; *Jones*, 260 S.W.3d at 345 & n.1; *Yanero*, 65 S.W.3d at 521; *Rivera*, 2014 WL 2536914, *8–9; and *Jerauld*, 353 S.W.3d at 639–40. For instance, in *Louisville Arena Authority, Inc. v. Ram Engineering & Construction, Inc.*, 415 S.W.3d 671, (Ky. Ct. App. 2013), the Court of Appeals prefaced its discussion of sovereign and governmental immunity "with the clarification that no official or employee of the Finance Cabinet has been named in an individual capacity. Consequently, we are not concerned with qualified official immunity and the distinctions between ministerial and discretionary functions." We are likewise concerned here only with governmental immunity because no official or employee of SHP is before us in this appeal. We therefore find the last paragraph of *Autry* inapposite. After careful

study of the Kentucky cases, we conclude that SHP is not entitled to governmental immunity on the negligence claim brought against it.

## IV.  CONCLUSION

SHP has not demonstrated its entitlement to summary judgment on the § 1983 claim for failure to train or supervise its LPN nurses, and SHP is not entitled to governmental immunity on the negligence claim.  Accordingly, we REVERSE the grant of summary judgment in favor of SHP and we REMAND the case for further proceedings consistent with this opinion.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting. I respectfully dissent. I would affirm the summary judgment granted in favor of defendant Southern Health Partners, Inc. (SHP) on both claims.

Regarding plaintiff Shadrick's § 1983 claim, the majority opinion acknowledges that SHP maintained a policy requiring its LPNs to monitor and treat Tyler Butler's staph infection under the guidance of its medical director, a licensed physician. Still, it concludes that the LPN training program posed so "obvious" a risk to Butler's rights that SHP can be held liable "without proof of a pre-existing pattern of [constitutional] violations." *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011). In so holding, the majority expands the theory of "single-incident" liability beyond the narrow circumstances contemplated in *City of Canton v. Harris*, 489 U.S. 378 (1989), and *Connick*, 131 S. Ct. at 1361–63.

With respect to plaintiff's state-law negligence claim, my colleagues take the opposite approach, limiting the availability of qualified official immunity in ways not recognized under Kentucky law. But precedent on this issue is clear: private entities that contract with a Kentucky county to provide medical services to county jail inmates—like SHP—are eligible for qualified official immunity irrespective of their business form or origin. *See Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 641 (Ky. Ct. App. 2011); *see also Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 719 (Ky. 2007).

I.

The first issue is whether the district court properly granted summary judgment in favor of SHP on Shadrick's § 1983 claim. The parties, my colleagues, and I agree that Shadrick's claim against SHP is controlled by *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

As we have repeatedly cautioned in the context of *Monell* claims, courts must resist the temptation to impose vicarious liability upon entities like SHP for the egregious conduct of their employees. Under *Monell*, governmental actors "are responsible only for their own illegal acts.

They are not vicariously liable under § 1983 for their employees' actions." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir.), *cert. denied,* 135 S. Ct. 758 (2014). Furthermore, the dispositive question regarding SHP's liability is whether "the challenged conduct occur[red] pursuant to [SHP's] 'official policy,' such that [SHP's] promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *Id.* (quoting *Monell*, 436 U.S. at 692). In other words, SHP "is liable under § 1983 only where, 'through its deliberate conduct,' it was 'the moving force behind the injury alleged.'" *Id.* at 389 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

Because the focus must be on SHP's own decisions rather than those of its employees, SHP can be found liable only if it has (1) consciously adopted a specific "policy" of perpetrating unconstitutional conduct despite (2) having actual or constructive notice that the policy will cause employees to violate constitutional rights, such that SHP can be considered "deliberately indifferent" to the fact that its employees will spread constitutional harm. *Connick*, 131 S. Ct. at 1359–60.

Given that *Monell* liability presupposes a conscious adoption of a course of action "from among various alternatives," *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985), a government entity's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359. After all, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id.* at 1363 (citation omitted). If an employee acts in a particularly egregious manner, it may be tempting to collapse the *Monell* analysis into a respondeat superior test and to blame the wrongdoer's employer for failing to ensure that she would do a better job. *See id.* at 1365 & n.12. This is the mistake Shadrick makes, claiming that "SHP's LPNs' responsibilities were so obvious, their violations of SHP's policies so multitudinous, and their ignorance of Mr. Butler's condition so glaring, that SHP must be held responsible." (Opening Br. at 30; *see also id.* at 31–32 ("The fact that SHP's nurses violated virtually every provision of SHP's policies bearing on Mr. Butler's care and treatment speaks to their lack of training, SHP's indifference, and its resultant liability.")).

But as the Supreme Court recently reiterated, an essential characteristic of a failure-to-train claim is that it requires more than merely substandard training. A plaintiff must show that the government entity's failure to train its employees in relevant respects is not merely a negligent omission; it must amount to a conscious "decision not to train certain employees about their legal duty to avoid violating citizens' rights." *Connick*, 131 S. Ct. at 1359. "'[D]eliberate indifference' is a stringent standard of fault"; *Monell* liability applies only when a state actor has itself decided to violate the Constitution by retaining a defective training program that it constructively or actually knows causes employees to violate citizens' constitutional rights. *Id.* at 1360 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).

In the present case, it certainly appears that one or more of SHP's employees was negligent in following SHP's policies and providing Butler with appropriate care—with catastrophic results. But the fact that SHP's training of these particular personnel may have been inadequate does not itself establish that SHP was deliberately indifferent to inmates' constitutional rights. Deliberate indifference, unlike negligence, requires intent. It is not enough to demonstrate only that SHP's training regimen did not comport with best practices; Shadrick must establish that SHP was on notice that its training program was constitutionally deficient but consciously decided not to correct it.

The evidence submitted by Shadrick does not create a jury question regarding whether SHP consciously decided to adopt a policy that it knew would cause its employees to violate inmates' constitutional rights. It is undisputed that SHP promulgated policies guiding its nurses' conduct in providing health care to inmates, required its nurses to read and sign its policies, provided on-the-job training to its nurses, and held routine monthly meetings with its nurses to review the policies and any updates to them. SHP's policies specifically required nurses to examine inmates presenting symptoms of drug or alcohol use or staph infections and to notify and seek treatment authority and review from the facility's medical director. In fact, Shadrick argued in the district court (and on appeal) that the individual nurses were liable because of their failure to abide by SHP's extant policies. In other words, Shadrick's claim against the nurses hinges partially on her theory that Butler's death would have been averted had the nurses followed the SHP policies upon which they had been trained. The majority is apparently swayed

by this argument, citing multiple instances in which SHP's employees failed to follow, or appeared unfamiliar with, the company's polices.  But if the underlying harm was caused by employees' deviation from SHP's policies, then *Monell* liability cannot lie:  the harm is the fault of the individual employees and is not attributable to the governmental entity that employed them.

Despite the fact that SHP trained its nurses on applicable policies that—if followed— would have prevented the harm suffered in this case, Shadrick contends that SHP should have trained them more extensively.  Specifically, she asserts that SHP should have trained its LPNs that they could not "treat[ ] conditions outside their scope of practice and without notifying or consulting SHP's contract physician."

"Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360.  Thus, Shadrick's claim turns on whether a reasonable jury could find that SHP had actual or constructive notice that its nurses were deficiently trained in violation of the Constitution, despite its policies. *Id.*  On the evidence Shadrick provided, I submit that it could not.

"[O]rdinarily," plaintiffs must demonstrate notice by pointing to a prior pattern of similar constitutional violations by inadequately trained employees. *Id.*  This is because, "[u]ntil the [government entity] had notice of persistent misconduct, it did not have 'the opportunity to conform to constitutional dictates,' nor could its inaction have caused the deprivation of [the plaintiff's] constitutional rights." *D'Ambrosio*, 747 F.3d at 388 (quoting *Connick*, 131 S. Ct. at 1360 n.7).  If the government entity continued to follow the training program, notwithstanding its awareness of past violations, the plaintiff may establish that the entity acted with the deliberate indifference "necessary to trigger municipal liability." *Bryan Cty.*, 520 U.S. at 407.

Alternatively, in a "narrow[er] range of circumstances," *see id.* at 409, deliberate indifference may also be proven under the "single-incident" theory of liability hypothesized by the Supreme Court in *Canton*, 489 U.S. at 390 & n.10.  In essence, the theory is that, in some "rare" circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of

violations." *Connick*, 131 S. Ct. at 1361. *Canton* gave one example of this hypothesis: where a municipality provides its police officers with firearms, the need to train officers on the constitutional limitations on the use of deadly force is "so obvious" that the failure to do so would amount to deliberate indifference. *Canton*, 489 U.S. at 390 n.10. Taking up the mantle of *Canton*, the majority concludes that an inmate's need for competent medical care is so obvious that SHP's failure to train its nurses regarding when to notify medical directors about suspected staph infections amounts to deliberate indifference.

There are two problems with this position. First, the single-incident theory of liability described in *Canton* applies only rarely outside of the use-of-deadly-force-training example that *Canton* provided. For example, the Fifth Circuit recently attempted to extend the single-incident liability theory to the failure of a prosecutor's office to train its prosecutors about their *Brady* obligations.[1] But the Supreme Court rejected that extension, observing that the *Canton* hypothetical "assumes . . . no knowledge at all" of the requisite constitutional standards, whereas it was undisputed that prosecutors knew the general contours of their *Brady* obligations. *See Connick*, 131 S. Ct. at 1363. More fundamentally, explained the Court, the *Canton* hypothetical involved a circumstance where a police officer was expected to make a professional judgment that lay outside his area of expertise: absent specific training, he would not be "equipped with the tools" needed to make the relevant legal determination. *Id.* at 1364. By contrast, an attorney asked to make a *Brady* determination is not required to go beyond the bounds of his professional specialty: he is a legal professional tasked with making a professional legal determination—which his employer could reasonably expect that his generalized professional training, on-the-job experience, and adherence to professional competence and ethics standards would generally prepare him to do. *See id.* at 1361–63. Given that an employer could expect a legal professional to be able to ascertain for himself his basic legal obligations, the failure of the prosecutor's office to alert its attorneys to the full panoply of their legal duties did not subject it to failure-to-train liability, even if "additional training would have been helpful." *Id.* at 1363.

---

[1] *See Brady v. Maryland*, 373 U.S. 83 (1963).

*Connick*'s reasoning is squarely applicable to the LPNs in the present case. An LPN making a rudimentary decision regarding how severe an inmate's symptoms are is not engaging in the type of professional cross-over envisioned in *Canton*'s hypothetical. Instead, LPNs in such situations are medical personnel making rudimentary medical judgments. Although the majority presents LPNs as if they have no medical ability whatsoever, they are clearly trained in the medical field, have at least some degree of knowledge about medical symptoms presented by inmates, and are expected to make at least basic decisions about identifying circumstances under which further medical examination (such as by a doctor) is necessary. No doubt more advanced training would make them better able to do so; but the fact that, in hindsight, SHP could have done more instead of primarily relying upon its LPNs' formal medical training does not make SHP liable under *Monell*. *See Connick*, 131 S. Ct. at 1364 ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.").

The second point is related. Even with the single-incident theory applied in this context, the particular need at issue—the need for increased training regarding when an LPN should contact a medical director—is far from "obvious." In this regard, the majority conflates the generalized need for competent medical care with the much more particularized need for LPNs to be trained regarding the appropriate circumstances under which to refer inmates to a medical director. *See Bryan Cty.*, 520 U.S. at 412 (observing that culpability "depend[s] on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff"). The *Canton* exception applies, if ever, only when the need is so patent as to be self-evident: training for armed officers on the constitutional boundaries of the use of deadly force, for instance. *See id.* at 410 (noting that the single-incident theory applies only if there is a "glaring omission in a training regimen"). By contrast, the need here is much more particularized. It is not at all obvious that an LPN who has already completed a course of study and has been specifically instructed to follow SHP's written policies will always need more training regarding when to contact a medical director about a suspected staph infection. It is undisputed that SHP did, in fact, have policies in place on this question, which it required its nurses to read and follow. Therefore, *Canton*'s hypothesized single-incident theory does not apply to this case.

Shadrick also argues SHP had notice that its training program was constitutionally deficient based on a prior pattern of similar constitutional violations by SHP employees. However, the majority declines to reach this issue. In this regard, I note that Shadrick's pattern-of-prior-incidents theory lacks its most basic requirement: a pattern.

The sequence of prior constitutional violations must be "similar" to the misconduct alleged in the case at hand for the prior violations to have put the government entity on notice that the same conduct was likely to reoccur. *Connick*, 563 U.S. at 1360. *Connick* gave some clues as to how particularized the similarity must be. There, the Court tied the notice requirement not simply to the generalized type of constitutional harm at issue, but to the specific manner in which the constitutional harm occurred. *Connick* held that four prior *Brady* violations did not place a prosecutor's office on notice that its training was inadequate "with respect to the sort of *Brady* violation at issue here" because none of the prior *Brady* violations "involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind." *Id.* In other words, the previous instances of misconduct must not only violate the same constitutional rights, but they must violate them in almost the same way. *See D'Ambrosio*, 747 F.3d at 388 (three prior instances of impermissible prosecutorial statements did not give municipality notice that a prosecutor would likely commit a *Brady* violation).

Shadrick claims that SHP's deliberate indifference to inmates' plight is demonstrated by the fact that, before Butler died, several other inmates received substandard medical treatment in other jails staffed by SHP. She points to two incidents in particular: (1) the March 2009 death of an inmate in a Warren County, Kentucky jail, under circumstances where the nurse hired by SHP failed to contact the medical director for an inmate who exhibited symptoms of alcohol withdrawal, *see Finn v. Warren Cty.*, 768 F.3d 441, 447 (6th Cir. 2014); and (2) the January 2010 death of an inmate in a LaRue County, Kentucky jail where a nurse allegedly failed to refer to a doctor an inmate who claimed that she was experiencing heart attack symptoms, *see Jones v. SHP*, No. 3:10-cv-00742 (W.D. Ky.).

These two incidents involved two different sets of medical symptoms at two different jails. Tragic as they were, these incidents did not give SHP knowledge that their employees at yet a different jail were likely to be unable to properly alert a medical director about an inmate

with a suspected staph infection.   After all, SHP is a large company:   it employs more than 700 nurses at 198 jails in twelve states.   The fact that two of SHP's 700 nurses in two of its 198 jails housing thousands of inmates made two bad decisions regarding when to contact a medical director about alcohol withdrawal or heart attack symptoms does not translate into knowledge that, absent more rigorous training, employees at all of its jails likely would make bad judgment calls about when to contact a medical director about a suspected staph infection. "As a matter of probability, if violations were the 'highly predictable consequence' of a failure to train, then we would expect to see more than just one violation in hundreds or thousands of cases." *Thompson v. Connick*, 578 F.3d 293, 305 (5th Cir. 2009) (Clement, J., dissenting), *rev'd*, 131 S. Ct. 1350 (2011).   It does not detract from the tragedy of the prior events to recognize that they cannot have made SHP "deliberately indifferent" to whether all 700 of its nurses needed more training on referring suspected staph infections to a medical director.

Shadrick also relies on her expert, who concluded that SHP should have known that its business model would present unacceptable risks of harm to inmates by relying too heavily upon LPNs rather than upon more highly trained medical practitioners.   But it bears emphasizing that SHP cannot be held liable under § 1983 merely for structuring or conducting its business in a negligent manner.   *Connick*, 131 S. Ct. at 1359.   In opposing SHP's motion for summary judgment, Shadrick was required to submit evidence from which a reasonable trier of fact could find that SHP consciously chose to violate inmates' constitutional rights.   *Id.* at 1359–60. On this record, a reasonable jury could not make that finding.

Finally, Shadrick asserts that SHP demonstrated deliberate indifference by ratifying its nurses' conduct through its after-the-fact investigation.   While the majority claims it does not reach this issue, it cites SHP's investigation and failure to discipline or retrain its LPNs as proof of deliberate indifference.   But *Monell* liability applies only where the government entity's policy caused the deprivation of the injured party's constitutional rights.   *D'Ambrosio*, 747 F.3d at 388–89.   Nothing SHP did after Butler died could have caused his death.   SHP's response to the death is irrelevant to the question of its deliberate indifference before the death.

It may be evident in retrospect that SHP's employees should have handled matters much differently.   However, SHP can be held liable under § 1983 only if it knew of its employees'

specific training deficits before Butler died in its care. Shadrick has not offered proof of that knowledge. The district court properly resisted the impulse to presume foreknowledge from hindsight clarity. I would affirm summary judgment on Shadrick's *Monell* claim against SHP.

## II.

The majority also reverses summary judgment in favor of SHP on Shadrick's state-law negligence claim, holding that SHP is not entitled to governmental immunity. In my view, the majority opinion overlooks Kentucky precedent affording qualified official immunity to private entities that contract with a Kentucky county to provide medical services to county jail inmates. *See Jerauld*, 353 S.W.3d at 641. Based on *Jerauld*, I would affirm the district court's ruling that SHP is entitled to qualified official immunity regarding Shadrick's state-law negligence claim.

Under Kentucky law, qualified official immunity is derivative of governmental (or "official") immunity. *Autry*, 219 S.W.3d at 717. Governmental immunity protects a government entity where "the entity exercises a governmental function," which is "a 'function integral to state government.'" *Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 99 (Ky. 2009) (quoting *Ky. Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 332 (Ky. 1990)). Governmental immunity extends not only to the actions of the entity, but also to the official acts of the entity's employees, agents, and alter egos. *Autry*, 219 S.W.3d at 717, 719.

When agents performing state functions are sued in their official capacities, they are absolutely immune from the claims. *Id.* at 718. When sued in their individual capacities, however, they may invoke only the doctrine of qualified official immunity, "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified official immunity is appropriate if the agent's conduct (1) is a discretionary, rather than a ministerial act—*i.e.*, one "involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment"; (2) is made in good faith; and (3) is within the scope of the agent's authority. *Id.*

There is no dispute that, under Kentucky law, qualified official immunity extends to private medical providers who contract with government entities to provide medical care to inmates. *See Jerauld*, 353 S.W.3d at 641. This is so because the application of qualified official

immunity does not depend upon the particular titular or employment characterization of the individual who is performing the governmental function on the government entity's behalf, but instead "rests . . . on the function performed." *Id.*; *see also Yanero*, 65 S.W.3d at 521. In other words, the question is whether the medical provider has stepped into the shoes of the state; if it has, it is entitled to the state's immunity protection.

In this regard, the Kentucky Court of Appeals' decision in *Jerauld* is dispositive. There, the court explicitly recognized that a private psychologist was entitled to qualified official immunity, despite the fact that he was not an employee of a county jail but was simply contracted to provide medical services there. *Jerauld*, 353 S.W.3d at 641. The determining factor was that the psychologist—regardless of his specific employment relationship with the county—was performing a government function on the government entity's behalf. *Id.*

*Jerauld* squarely forecloses plaintiff's claim that SHP is not entitled to qualified official immunity under Kentucky law. *Jerauld* holds that private entities that have contracted with a Kentucky county to provide medical services to inmates in the county jail are eligible for qualified official immunity. *Id.* SHP—a private entity that has contracted with a Kentucky county to provide medical services to inmates in the county jail—is therefore eligible for qualified official immunity under Kentucky law.

The majority attempts to distinguish *Jerauld* in two different ways. Neither is persuasive.

First, the majority asserts that immunity extends to private corporations only if they were created by the state government—which SHP clearly was not. Contrary to the position of the majority, *Comair* did not erect an inflexible two-pronged test in which the threshold question is whether a private entity was created by a state agency as opposed to having been birthed in the free market. To begin with, *Comair*'s observation that an entity's origins could be relevant to the immunity analysis came not in the context of a comparison between state-created entities and private entities, but between state-created entities and municipality-created entities. 295 S.W.3d at 99–100. In general, entities created by a state or county are entitled to share in the state's sovereign immunity if they exercise a state function. However, entities created by a municipal corporation are generally not entitled to immunity because Kentucky state sovereign immunity does not extend to local municipalities. *Id.*; *see id.* at 94–95. *See also Coppage Constr. Co. v.*

*Sanitation Dist. No. 1*, 459 S.W.3d 855, 860 (Ky. 2015) ("*Comair* set forth the aforementioned analytical framework that focuses on whether the entity in question was created by the state or a county, *as opposed to a city*, and then whether the functions the entity performs are integral to state government." (emphasis added)). Under *Comair*, "the origins of the entity" may figure into the analysis only because the etiology of the entity might answer whether the function that it performs implicates state-level concerns as opposed to merely local ones. *Comair*, 295 S.W.3d at 99; *see also Coppage Constr. Co.*, 459 S.W.3d at 861–62. But if the source and nature of the function is otherwise clear—because, for example, the private entity has contracted with the state or county to perform one of its quintessentially governmental functions—there is no need to retrace the entity's genesis. That explains why—in a decision post-dating *Comair*—the court in *Jerauld* found no need to interrogate the particular corporate form under which the psychologist was providing services to the prison; it was enough that he had contracted to perform a state—rather than a local—function. 353 S.W.3d at 641.

In addition, it strains credulity to assert that *Comair* constructed a new, inflexible, two-pronged official-immunity test when much of its analysis is dedicated to rejecting the court's previous two-pronged official-immunity test as "overly simple, failing to allow for subtlety, and too limiting." *Comair*, 295 S.W.3d at 99 (limiting *Berns*, 801 S.W.2d at 332). In fact, *Comair* explicitly disclaimed any assertion that it was imposing a bright-line test, noting that the question of official immunity must instead be resolved on a "case by case analysis." *Id.* According to the court, an inquiry into "the origins of the entity" claiming immunity should not be "reduce[d] . . . to a simple test" but should instead "be treated as a guiding principle." *Id.*

The recent decision from the Kentucky Court of Appeals in *Kentucky River* does not suggest otherwise. *See Ky. River Foothills Dev. Council, Inc. v. Phirman*, No. 2013-CA-001858-MR, 2015 WL 1746483 (Ky. Ct. App. Apr. 17, 2015). In *Kentucky River*, the court grappled with whether private organizations that merely received grants from the state were entitled to qualified official immunity. The court reasoned that they were not, observing that they had not been created by the state and that "[a] line must be drawn somewhere before the concept of governmental immunity is expanded far beyond any reasonable parameter." *Id.* at *9.

SHP's circumstances are, of course, not those of an entity that simply receives a governmental grant. Grants to private organizations are typically used to encourage private actors to engage in conduct the state deems beneficial for the general citizenry; grants are not ordinarily used to outsource a government's own core functions. *Kentucky River* therefore speaks only to situations where a grant is used to incentivize private entities to perform conduct "traditionally associated with government," such as furthering beneficial progress in "poverty, education, housing, medical research, or other similar concerns." *Id.* It does not control cases like this one, where the conduct outsourced to the private sector—providing medical care for inmates—is not merely something that traditionally the state has encouraged but is something that traditionally the state alone has performed. The best way to understand *Kentucky River*, in other words, is as creating another distinction based upon the function performed. If the private entity is pursuing ends that are simply consonant with the state's interests, then it is not eligible for qualified official immunity, regardless of its source of funding. *See Coppage Constr. Co.*, 459 S.W.3d at 862 ("[N]ot every 'public purpose' qualifies as an 'integral state function.'"). But if the private entity's activity actually supplants the state's performance of an activity traditionally within the state's bailiwick—such as running a prison—then the doctrine is available to the private entity that is performing the traditional state function on the state's behalf. *See id.* at 864 (listing, as examples of "traditional and necessary state function[s]," "those functions performed by the state police, our public schools, *the corrections system*, and public highways and airways." (emphasis added)).

To the extent *Kentucky River* characterized *Comair* as providing for a two-part test, we are constrained to follow precedent from the Supreme Court of Kentucky where it diverges from that of the lower courts. *Compare Kentucky River*, 2015 WL 1746483, at *6 ("The test for whether an entity qualifies for governmental immunity is two-pronged.") *with Comair*, 295 S.W.3d at 99 (the inquiry into "the origins of the entity" claiming immunity should not be "reduce[d] . . . to a simple test"). *See also Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 305 n.1 (Ky. 2014) (suggesting that *Comair* was most focused on the performance of a government function).

The majority also attempts to distinguish *Jerauld* by asserting that Kentucky extends the doctrine of qualified official immunity to individuals only, not to corporations. Again, *Jerauld*

unequivocally holds that qualified official immunity extends to a private medical provider if he contracts as an individual to provide medical services to a county jail. *See Jerauld*, 353 S.W.3d at 641. Yet, under the majority's view of Kentucky law, qualified official immunity would not extend to the same medical provider if he provided identical services but chose to organize his business as a limited liability corporation instead of a limited liability partnership.

The flaw with this position is that Kentucky has never held that the form of a defendant's business is a determinative factor for qualified official immunity purposes. *Jerauld* gives no hint that the defendant's business form was relevant to the defense; in fact, it explicitly reiterated that formalities such as the "status" of an agent were irrelevant to the issue and that the crucial inquiry centered upon "the function performed." *Id.* And Kentucky courts have repeatedly rejected the notion that a private entity performing a governmental function is not entitled to qualified official immunity merely because it is a private corporation taking on the performance of a state function by contract. *See Bryant v. Pulaski Cty. Det. Ctr.*, 330 S.W.3d 461, 465 (Ky. 2011); *Autry*, 219 S.W.3d at 719; *Yanero*, 65 S.W.3d at 529–30. In the same vein, the majority's assertion that SHP's status as an independent contractor matters to the question of qualified official immunity cannot be reconciled with Kentucky's repeated admonition that application of qualified official immunity "rests not on the status or title of the officer or employee, but on the function performed." *Jerauld*, 353 S.W.3d at 641. "[S]tatements by the entity [seeking immunity]," whether made in a contract or otherwise, "are not controlling." *Comair*, 295 S.W.3d at 102.

To reach its conclusion, the majority finds it necessary to downplay portions of Supreme Court of Kentucky decisions as dicta and as "incorrect[ ]" in order to reconcile them with its preferred interpretation of decisions from the Kentucky Court of Appeals. But a far simpler way to resolve the purported conflict is to recognize there is none. The individual-corporation binary the majority posits in this context is illusory. The majority appears to conflate the concepts of "individual capacity," "individual persons," and "natural (as opposed to corporate) persons." In any event, Kentucky qualified official immunity does not depend upon the distinctions of corporate form or the specifics of corporate genealogy. The "important aspect" of the official-

immunity analysis, as *Comair* emphasized, is the entity's function, not its status nor its origin. *Comair*, 295 S.W.3d at 99.

That determination resolves Shadrick's negligence claim against SHP. There is no dispute that SHP, despite its designation as an independent contractor, is providing a paradigmatic government function—namely, providing medical care to incarcerated individuals. SHP has stepped into the county's shoes to perform that function, and to the extent that its conduct is in good-faith, discretionary furtherance of that function, it is entitled to qualified official immunity. *See Yanero*, 65 S.W.3d at 530. Nor is there any question that SHP meets the remainder of the qualified official immunity elements. *See id.* at 522. Shadrick does not argue that SHP exceeded its authority or acted in bad faith, and there is no merit to the claim that SHP's promulgation of policies for how to best implement its dictate from the county is a ministerial rather than a discretionary act. *See Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 150 (Ky. 2003) ("Promulgation of rules is a discretionary function."); *Yanero*, 65 S.W.3d at 529 (same). Accordingly, the district court correctly ruled that SHP was entitled to qualified official immunity under Kentucky law.

III.

For these reasons, I respectfully dissent. I would affirm the district court's judgment.