**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0559n.06

**No. 17-3964**

| | | |
|---|---|---|
| UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT | | **FILED**<br>Nov 05, 2018<br>DEBORAH S. HUNT, Clerk |

|  |  |  |
|---|---|---|
| CAMERON NORTH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| CUYAHOGA COUNTY; CATHERINE CLACK; FATHER MIROLOVICH, A.P.N.; JOHN DOE; UNKNOWN CORRECTIONAL OFFICERS; UNKNOWN DOCTORS; UNKNOWN NURSES, | ) ) ) ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |

BEFORE:    CLAY, STRANCH, and LARSEN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  Twenty-year-old Cameron North suffered a stroke caused by untreated endocarditis—an infection in his heart—while incarcerated at the Cuyahoga County Correctional Center.  North survived but lost partial use of his left side and suffers from depression.  He filed suit against medical and correctional staff at the jail and against Cuyahoga County pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  Finding no constitutional violation, the district court granted summary judgment and dismissed the claims against the individual defendants and the County.  On appeal, North challenges only the dismissal of his *Monell* claim against the County, arguing that the County's policies, customs, and failure to train its employees deprived him of his right to constitutionally

adequate medical care. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I.    BACKGROUND

Cameron North entered the Cuyahoga County Correctional Center (a county jail) in February 2013 to begin an eight-month sentence for a probation violation. He had an initial health screening the next day and underwent a physical examination approximately one week later. Shortly after arriving at the jail, North began working as a trustee in the kitchen. Trustee status carries various privileges, including better food and living conditions; inmates must be medically cleared before becoming trustees and can have their status discontinued if they develop certain medical issues.

At some point during his incarceration, North began experiencing health problems, starting with withdrawal-related body aches and pains. On March 27, North was taken to the medical unit after complaining to a correctional officer (CO) about a possible pulled muscle in his arm. Afraid that he would lose his trustee status, North told Nurse Catherine Clack that his "arm hurt earlier [but was] better now" and signed a refusal of medical treatment form. On March 29, North reported to his grandmother that his hand was swollen and painful, that he could barely move his thumb, and that he had woken up the last two nights sweating badly. North concealed this injury from his COs and did not seek medical attention; about one week later, the swelling and pain had improved significantly.

In early May, North began experiencing pain in his neck, shoulders, and abdomen that worsened when he lay down or breathed deeply. North believes he completed a "kite" form to request medical care at some point in early May.[1] On May 8, he called off work and told his COs

---

[1] North's memory of his time in the jail is significantly impaired due to his stroke.

that he wanted to go to the medical unit. North's mother, Elizabeth North, called the jail that same day and a "warden's medical concern" was noted. North was seen by Nurse Practitioner Father Mirolovich that evening. His blood pressure was 151/56, his pulse was 101, and his temperature was 99.2 degrees. Mirolovich documented North's complaints of neck, shoulder, and abdominal pain, that the pain was associated with taking deep breaths, and that it had begun two days earlier. Mirolovich examined North but did not review North's medical records during that visit. Mirolovich noted that North's abdomen was tender when palpated, which he believed required further evaluation. Finding no point of tenderness on North's shoulder, Mirolovich suspected that North could be experiencing referred pain, possibly caused by inflammation of the gallbladder. Mirolovich found no other abnormalities during the physical examination. He ordered urinalysis, which he marked as "done," ordered lab work (blood tests) for the next morning, and gave North a packet of ibuprofen. Nurse Clack then "noted" the order form, which indicates that she filled out a lab requisition form and brought it to the lab. Neither a lab requisition form nor urinalysis test results appear in the record.

Despite Mirolovich's orders, North's blood was not drawn the following morning; in fact, it was never drawn. The parties dispute why the blood test did not happen. North testified at his deposition that he did not refuse the blood test and that he remembers asking his COs about the blood tests after May 8. Jail phone call recordings from May 8 and 9 indicate that North expected his blood to be drawn on May 9 and that the results would be in the following day. North's mother called the jail again on May 9 and submitted another warden's medical concern. At some point on May 9 or 10, North became sufficiently concerned about losing his trustee status and being transferred to a more dangerous housing pod that he tried to get out of having the blood test by telling a nurse that his pain had gone away.

On May 10, North's trustee status was discontinued. The discontinuation order was signed by Mirolovich but did not contain any information about North's medical condition. Mirolovich did not inquire into North's condition or check to see if North's labs had come back. Despite having his trustee status discontinued, North was temporarily permitted to stay in his housing pod but was not allowed to work.

On May 10, North told his mother that he still had not had his blood drawn, that he planned to tell medical that he felt fine, and that he was going to take the blood test. North's mother again called the jail and submitted a third warden's medical concern. No one came to get him that day, and North hoped the blood test would happen over the weekend or on Monday. On Saturday, May 11, North's blood still had not been drawn. North reported to his family that he was feeling better; his shoulder pain was still present, but his abdominal pain had mostly ceased, leading him to believe that he had simply pulled a muscle in his back. On May 13, North told his mother that his blood test still had not happened; he stated that he did not want to do the test but would in order to hopefully go back to work. When his mother suggested that he submit a kite, North responded that he would not.

While talking on the phone that evening, North collapsed. A medical emergency was called at approximately 9:20 p.m. and North was transported to the medical unit, where he was observed for approximately one hour. At 10:15 p.m., North was examined by a nurse practitioner and EMS was called; North was transported to the hospital at 10:45 p.m. It was subsequently determined that North had suffered a stroke caused by endocarditis, an infection in his heart. North underwent heart surgery and significant physical therapy and has lost partial use of his left side.

## II.    ANALYSIS

### A.    Standard of Review

This court reviews a grant of summary judgment de novo.  *See Quigley v. Thai*, 707 F.3d 675, 679 (6th Cir. 2013).  Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Id.*  We turn directly to the merits for complete resolution of this case.

### B.    Constitutional Violation

"To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'"  *Shadrick v. Hopkins County*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010)).  The constitutional right at issue in this appeal is the Eighth Amendment's protection against cruel and unusual punishment. The governing standard for an Eighth Amendment violation is deliberate indifference to an inmate's serious medical need.[2]  *See Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994).  An inmate can bring suit under § 1983 for an Eighth Amendment violation "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (footnotes omitted).

---

[2] The phrase "deliberate indifference" is also used in analyzing a specific category of *Monell* claims (namely those brought under a failure-to-train, failure-to-supervise, or failure-to-screen theory of liability).  *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 365–66 (6th Cir. 1993) (noting that the deliberate indifference test is used to analyze failure-to-train claims but not affirmative policy or custom claims); *see also Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017).  In the failure-to-train municipal liability context, the plaintiff must show that the municipality acted with deliberate indifference to the risk of constitutional violations.  *See Garner*, 8 F.3d at 365.  The standard governing whether there is an underlying Eighth Amendment constitutional violation, in contrast, requires deliberate indifference to an inmate's serious medical needs.  *See Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994).

Deliberate indifference requires proof that the inmate had a sufficiently serious medical need and that a municipal actor knew of and disregarded an excessive risk to the inmate's health or safety. *See Winkler v. Madison County*, 893 F.3d 877, 890–91 (6th Cir. 2018). The deliberate indifference standard, thus, has both objective and subjective components. *Id.*

The objective component "requires that the inmate have a sufficiently serious medical need such that she is incarcerated under conditions posing a substantial risk of serious harm." *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) (citation and internal quotation marks omitted). A medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jones*, 625 F.3d at 941 (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

To satisfy the subjective component, a plaintiff must show that officials had a "sufficiently culpable state of mind," namely "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (citations and internal quotation marks omitted). Deliberate indifference is greater than negligence but does not require proof that the officials intended to cause harm. *See Shadrick*, 805 F.3d at 737. "Acting or failing to act 'with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Id.* at 737–38 (quoting *Farmer*, 511 U.S. at 836). The plaintiff must "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Phillips v. Roane County*, 534 F.3d 531, 540 (6th Cir. 2008) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Recognizing that officials "do not readily admit this subjective component," courts may "infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.* (citation omitted). The "very fact that the risk was obvious" may permit a factfinder to conclude that an official was aware of it, *Farmer*, 511 U.S. at 842, and a defendant's denial of knowledge is not dispositive, *see Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005). Plaintiffs are not required to prove that the defendant was aware of the exact nature or consequences of the defendant's action or failure to act; demonstrating that the defendant was aware of the plaintiff's condition and knew that "serious risks accompany" it is sufficient. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). An official's failure to follow applicable policies and protocols can be persuasive evidence of deliberate indifference in the Eighth Amendment context. *See Phillips*, 534 F.3d at 541. We turn next to the claim on appeal, whether Cuyahoga County is liable for North's alleged Eighth Amendment violation.

## C.     Municipal Liability

Municipalities are not subject to respondeat superior liability in § 1983 actions; rather, they are responsible only for injuries caused by those acts that may fairly be said to represent official policy or by their policies or customs. *See Ford*, 535 F.3d at 495. In addition to demonstrating an underlying constitutional violation, "[a] plaintiff bringing a § 1983 claim against a municipality must . . . identify the policy or custom that caused her injury." *Id.* In the absence of a formally approved policy, a "custom" can give rise to municipal liability when the "practice is so widespread as to have the force of law." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). In addition to identifying "conduct properly attributable to the municipality," *id.*, a plaintiff must show that the municipality was a "moving force" behind the alleged violation, *Monell*, 436 U.S. at 694. In other words, "a plaintiff must identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy."

*Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted); *see also Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003). This type of municipal liability is sometimes referred to as an affirmative policy or custom theory.

An additional theory of municipal liability is based on a municipality's failure to adequately train or supervise its employees. This can give rise to liability when the training and supervision "were inadequate for the tasks the [employees] were required to perform, the inadequacy resulted from [the municipality's] deliberate indifference, and the inadequacy actually caused, or is closely related to, [the plaintiff's] injury." *Shadrick*, 805 F.3d at 738. A plaintiff can make this deliberate indifference showing in one of two ways:

> [He] can show a pattern of similar constitutional violations by untrained employees and [the municipality's] continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees . . . . Alternatively, [the plaintiff] can establish a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation. This second mode of proof is available in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.

*Id.* at 738–39 (brackets, citations, and internal quotation marks omitted). "Single-incident liability" is available in cases alleging inadequate training of nurses in a correctional setting. *See id.* at 742 ("Because it is so highly predictable that a poorly trained [licensed practical] nurse working in the jail setting utterly lacks an ability to cope with constitutional situations, a jury reasonably could find that [the defendant's] failure to train reflects deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights." (brackets, citations, and internal quotation marks omitted)).

### D. Application

North pursues both affirmative policy or custom and failure-to-train theories of liability in his suit against Cuyahoga County. We first ask whether North has shown that medical or

nonmedical jail personnel violated his Eighth Amendment right to adequate medical treatment—in other words, whether anyone at the jail acted with deliberate indifference to North's serious medical needs.

### 1.    Eighth Amendment Violation by Jail Personnel

We begin with the objective prong of the Eighth Amendment deliberate indifference test. North argues that endocarditis, an infection in the heart, is an objectively serious medical condition. According to Dr. Lawrence Mendel, North's expert witness, endocarditis "is a serious and potentially fatal medical issue." The County does not dispute that North has satisfied the objective prong. *See Kosloski v. Dunlap*, 347 F. App'x 177, 179 (6th Cir. 2009).

Turning next to the subjective prong, North alleges that several named and unnamed jail personnel were deliberately indifferent to his serious medical needs. We analyze each individually.

#### a.    *Nurse Practitioner Mirolovich*

North first argues that Nurse Practitioner Mirolovich was deliberately indifferent by providing a deficient examination on May 8; failing, in the days that followed, to ensure that the ordered lab work was completed; and signing off on the May 10 order discontinuing North's trustee status without providing any follow-up care. North cites to this court's decision in *Phillips v. Roane County* in support. In *Phillips*, a jail doctor conducted a perfunctory evaluation of a detainee, during which he ran no tests and "failed to even touch her." 534 F.3d at 544. A few days later, after the detainee submitted a second medical request complaining of a possible kidney infection, the doctor ordered a urinalysis but "failed to follow up or confirm that the test had been done." *Id.* We concluded that these facts were "sufficient to establish that [the doctor] had knowledge of [the detainee's] serious need for medical attention and disregarded that need." *Id.*

Mirolovich's evaluation of North was less cursory than the evaluation performed by the doctor in *Phillips*. Mirolovich asked North about his symptoms and conducted a physical examination based on those symptoms, which included looking at North's eyes, listening to his lungs and heart, and palpating his abdomen, neck, and shoulder. Although Mirolovich knew about North's neck, shoulder, and abdominal pain, there is no indication that he was aware of any chest pain. Having examined North, Mirolovich ordered additional testing, including urine and blood work. Mirolovich did not follow up to verify that those tests were performed; instead, he relied on the medical staff to ensure that they were completed. The trustee discontinuation form that Mirolovich signed two days after examining North contained no information about North's medical condition, and Mirolovich testified that he relied on the medical staff to follow protocols in deciding whether to discontinue a trustee's status. Mirolovich's practices may well have been negligent—in that he should have taken a more active role in ensuring that North received the testing and treatment he needed—but they do not support an inference that Mirolovich disregarded a known or obvious risk of serious harm.

### b. Nurse Clack

Next, North argues that Nurse Clack acted with deliberate indifference when she failed to properly complete the lab requisition form pertaining to North's blood and urine tests. On May 8, Clack "noted" Mirolovich's form ordering lab work and urinalysis for North. She has no memory of this particular incident but testified that when she "notes" an order, it means that she has filled out a lab requisition form and put it in the lab. Clack understood Mirolovich's note that the urinalysis was "done" to mean that the test had already been completed and reviewed by Mirolovich. Neither urinalysis test results nor a lab requisition form appears in the record. Viewing the evidence in the light most favorable to North, the record supports an inference that Clack either failed to properly complete the lab requisition form or failed to take it to the lab. And

in any event, Clack failed to take steps to verify that the lab work was completed, instead relying on other members of the medical staff once she did her part. On this record, Clack's conduct was, at most, negligent.

### c. Other Medical and Non-Medical Personnel

North also argues that other medical and non-medical personnel at the jail were deliberately indifferent to his serious medical needs between May 8 and 13. Specifically: (1) COs failed to ensure that North received his blood test despite North's repeated complaints and requests; (2) the warden's assistant failed to document at least some calls from North's mother; and (3) Nursing Director Patricia Ruzicka Regan directed North's mother to call the warden, rather than taking any steps to ensure that North received medical care.

These claims all falter on the subjective awareness prong. Even assuming the COs were aware that North was supposed to go to the medical unit, the record contains insufficient evidence that any of them were subjectively aware of a serious risk to North's health. The COs also may not have disregarded the risks they were aware of: there is some evidence in the record demonstrating that COs contacted the medical unit when North complained about his arm in March and again in the days following North's May 8 appointment with Mirolovich. Likewise, while the warden's assistant was supposed to document medical concerns from family members, her failure to do so does not rise to the level of deliberate indifference as there is insufficient evidence that she was subjectively aware of the severity of North's condition.

The claim as to Nursing Director Ruzicka Regan suffers from the same infirmity. When Sgt. Philip Christopher received Ms. North's call on May 9, he called Ruzicka Regan, advised her of Ms. North's concerns and that she had submitted a medical concern to the warden's office the previous day, and asked if Ruzicka Regan would speak with Ms. North. Ruzicka Regan advised Christopher to have Ms. North submit another medical concern with the warden's office.

Christopher did not remember what he conveyed to Ruzicka Regan but speculated that it may have been either that North complained of pain under his rib or that he had not yet been seen by the medical unit. Ruzicka Regan did not recall this conversation with Christopher but testified that when she receives a complaint from a family member, she would ordinarily place the inmate on the sick call list and speak with the family member. Her failure to do so in this case was likely negligent; however, the record does not show that she was aware of, and disregarded, a substantial risk of harm.

In sum, North is unable to show that any jail employee acted with deliberate indifference to his serious medical needs.

### 2. County Liability in the Absence of a Violation by Jail Personnel

Even if no individual violated North's Eighth Amendment rights, North argues that the County can still be held liable for his injury because its policies and customs caused North to be denied constitutionally adequate medical care.

There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). A court's finding that an individual defendant is not liable because of qualified immunity, however, does not necessarily foreclose municipal liability. *See Garner*, 8 F.3d at 365; *see also Richko v. Wayne County*, 819 F.3d 907, 920 (6th Cir. 2016) (rejecting the argument that a county cannot be held liable because the individual defendants are not liable as "unsound"). Whether and under what circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct is a more complicated question—one that this court recently noted in *Winkler*, 893 F.3d at 899–900.

*Winkler* acknowledged the broad statement in *Watkins v. City of Battle Creek*, 273 F.3d

682, 687 (6th Cir. 2001), that, without a constitutional violation by an individual defendant,

municipal defendants cannot be held liable. 893 F.3d at 899–900. We also noted, however, that

> other cases from this circuit have indicated that [this] principle might have a narrower application. Judge Cole, in a concurring opinion in *Epps v. Lauderdale County*, 45 F. App'x 332 (6th Cir. 2002), explained:
>
> > When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality. But a finding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm. . . . A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy. A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties. Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Id.* at 900 (quoting *Epps*, 45 F. App'x at 334–35 (Cole, J., concurring)). There is "no indication

that *Watkins* considered any of the situations discussed in *Epps*," *id.*, and the Supreme Court case

it relies on, *Heller*, 475 U.S. 796, "is not nearly so sweeping regarding the scope of *Monell*

liability," *Winkler*, 893 F.3d at 900.

Several other circuits have interpreted *Heller* to permit municipal liability in certain

circumstances where no individual liability is shown. *See id.* at 900–01; *Fairley v. Luman*, 281

F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the

City*, the fact that individual officers are exonerated is immaterial to [municipal] liability under

§ 1983."); *Speer v. City of Wynne*, 276 F.3d 980, 985–86 (8th Cir. 2002) ("Our court has previously

rejected the argument that *Heller* establishes a rule that there must be a finding that a municipal employee is liable in his individual capacity as a predicate to municipal liability. . . . The appropriate question under *Heller* is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors."); *Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001) ("*Heller* should not, of course, be applied indiscriminately. For example, where alleged injuries are not solely attributable to the actions of named individual defendants, municipal liability may still be found." (citing *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999))); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) (holding that, in certain circumstances, "an underlying constitutional tort can still exist even if no individual police officer violated the Constitution"); *see also Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (permitting the plaintiff to pursue a *Monell* claim where widespread, systemic, gross deficiencies in the jail's medical recordkeeping and scheduling systems resulted in the denial of medical care, even though no individual medical provider could be held responsible); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (explaining, the year before *Heller* was decided, that *Monell* and its progeny "do not require that a jury must first find an individual defendant liable before imposing liability on local government" in part because "if the jury were to find, as it did, that the deprivation of [the plaintiff's] constitutional rights was a result of understaffing, then it would logically find no fault on the part of the individual arresting officers"); *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985) (holding, the year before *Heller* was decided, that "[a]lthough the acts or omissions of no one employee may violate an individual's constitutional

rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights").

In many cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also mean that the plaintiff has suffered no constitutional violation. In a subset of § 1983 cases, however, the fact that no individual defendant committed a constitutional violation—e.g., acted with deliberate indifference to an inmate's serious medical need—might not necessarily "require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm." *Epps*, 45 F. App'x at 334 (Cole, J., concurring).

The type of claim North advances—one premised on failure to act rather than affirmative wrongdoing—might fit within this analysis. Assuming that our caselaw allows for such an approach, we consider his affirmative policy or custom and failure-to-train claims in turn.

### a. Affirmative Policy or Custom

As discussed above, in addition to demonstrating a constitutional violation, a plaintiff pursuing an affirmative policy or custom claim against a municipal entity must (1) show the existence of a policy, (2) connect that policy to the municipality, and (3) demonstrate that his injury was caused by the execution of that policy. *See Garner*, 8 F.3d at 364. This does not require a showing that the municipality acted with deliberate indifference to the risk of constitutional violations. *See id.* at 365–66 (the deliberate indifference test is used to analyze failure-to-train claims but not affirmative policy or custom claims); *see also Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017). Here, however, because North has not demonstrated that any individual jail employee violated his Eighth Amendment right to adequate medical care by acting with deliberate indifference, he must show that the municipality itself, through its acts, policies, or customs, violated his Eighth Amendment rights by manifesting deliberate indifference

to his serious medical needs. *See Ford*, 535 F.3d at 495 (explaining that, in the absence of a constitutional violation by an individual officer, the Eighth Amendment deliberate indifference standard "is relevant to the ultimate determination of whether a municipality can be held liable" for an Eighth Amendment violation). In other words, deliberate indifference is relevant to North's policy-based *Monell* claim because it is necessary to our determination of whether North suffered an Eighth Amendment injury.

North argues that the jail had a custom of denying and delaying inmates access to medical care. Specifically: (1) inmates were unable to access medical care because COs, who were not medically trained, had discretion in deciding whether to report inmate medical requests and complaints to the medical unit, and some failed to do so, and inmates who submitted medical kites were often subject to long delays; (2) the jail had a practice of arbitrarily revoking trustee status, creating a coercive environment in which trustees like North avoided medical care even when they needed it; and (3) the medical records system did not function properly and there were no systems in place to ensure that ordered lab work or other needed follow-up care actually happened.

We first consider the arguments related to medical requests and kites. According to jail policy, kites are the primary mechanism through which inmates request non-emergency medical care. Nurses generally review and respond to kites within 24 hours, though response time depends on the severity of the medical need, and kites were occasionally lost or inadvertently not responded to. In addition to submitting kites, inmates can ask their COs to contact the medical unit for them. Upon receiving such a request, COs are expected to contact their supervisor or the medical unit directly, but they can exercise some discretion in deciding how to respond and may instruct an inmate to submit a kite for a minor issue. Some COs had a practice of passing along every legitimate request to the medical unit or their supervisor, and some contacted medical even if the

inmate did not request treatment. Inmates sometimes complained that COs were not contacting the medical unit when they so requested or were not doing so as quickly as desired. North has not presented evidence showing a widespread custom of COs failing to properly forward medical concerns and requests. In light of the alternate means of requesting medical care available to inmates, any custom of minimal CO discretion does not rise to the level of deliberate indifference to serious medical needs in violation of the Eighth Amendment.

North also argues that the jail arbitrarily revoked inmates' trustee status when they sought medical care, creating a coercive environment in which trustees would avoid needed medical treatment. Medical personnel were responsible for evaluating whether to discontinue an inmate's trustee status for a medical reason, and inmates were aware that they might lose their status if they had medical issues. Although North's fear of losing his status and housing caused him to conceal or minimize his medical needs, it is not unreasonable for the County to have a policy that prohibits inmates with certain medical problems from working, especially in the kitchen, where there is risk both to the inmate and to others. The apparent lack of clear protocols could create a risk of arbitrary enforcement but, under these circumstances, does not rise to the level of deliberate indifference to serious medical needs in violation of the Eighth Amendment.

Finally, North argues that the jail's recordkeeping system was deficient and that there was no system in place to ensure that ordered medical tests and treatment were actually performed. At the time of North's incarceration, the jail still used a paper records system. Inmate charts were kept, but nurses and providers did not always have them, especially when an inmate came to the medical unit unexpectedly and was not on the sick call list. The jail had some recordkeeping policies, such as a requirement that "[i]nmates will be given a professional clinical judgment

regarding their health condition and will receive care that is ordered." However, certain documents that should have been in North's chart—assuming they existed—apparently were not there.

While imperfect, the apparent problems with the recordkeeping system seem to consist of "one or two missteps" rather than the kind of widespread, gross deficiencies that would support a finding of deliberate indifference. *Daniel*, 833 F.3d at 734–35 (quoting *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016)). Providers, nurses, medical technicians and, to a lesser extent, COs, each played a role in ensuring that inmates received medical care. There was apparently no backup system in place to ensure that mistakes were caught and corrected. As discussed above, however, inmates could follow up by submitting a kite and/or talking to their CO, thereby minimizing the likelihood that an error would go undetected. North has shown only one other concrete example of a patient who experienced a delay in lab testing. Meanwhile, jail personnel repeatedly affirmed that they had not witnessed instances when inmates' medical needs were not met in a timely fashion. Nurse Clack agreed that it was "possible" that she had seen "a delayed provision of medical care that result[ed] in some kind of medical problem for an inmate," but she explained those delays were caused not by failures within the medical unit, but by patients who did not go to the medical unit in a timely fashion. Another nurse at the jail similarly could not think of "any specific instance" when ordered lab work was not completed in a timely fashion or a delay in care otherwise resulted in medical problems for an inmate. When Christopher was asked the same questions, the only example he could think of was North's case.

On this record, North has not demonstrated systemic County deficiencies that rise to the level of deliberate indifference to serious medical needs in violation of the Eighth Amendment.

### b.    *Failure to Train*

Lastly, North argues that the County failed to adequately train its medical and non-medical personnel. North must demonstrate that the training was "inadequate for the tasks the [employees]

were required to perform, the inadequacy resulted from [the County's] deliberate indifference, and the inadequacy actually caused, or is closely related to, [his] injury." *Shadrick*, 805 F.3d at 738.

We begin with the training provided to non-medical (correctional) personnel. Although COs exercised some discretion, they typically passed inmate medical requests along to the medical unit and did not attempt to assess the inmate's medical needs on their own. Furthermore, inmates were able to request medical care through the kite system and did not have to rely on COs to access care. Failing to provide COs with additional medical training, therefore, does not constitute deliberate indifference in this case.

This court's decision in *Shadrick* is instructive with respect to the medical personnel training. In *Shadrick*, the jail contracted with a company to provide medical care; the company, in turn, employed licensed practical nurses (LPNs) to provide medical care to the inmates. 805 F.3d at 728. The LPNs came into the job with some medical training but lacked the authority to diagnose conditions and received no substantive training once employed. *Id.* at 740. Although written policies and procedures existed, LPNs were unable to discuss or identify the requirements of these policies and protocols, failed to follow them, and were permitted to use them at their discretion; LPNs were also allowed to define the scope of their own practice. *Id.* at 740–41. Furthermore, despite a written policy to the contrary, the LPNs followed an unwritten custom of providing medical assistance only if an inmate requested it or if there was an emergency. *Id.* at 734, 740–41. Taken together, this evidence was sufficient to permit a jury to find that the training program was inadequate and that the company was "deliberately indifferent to the need to train and supervise its LPN nurses to provide adequate medical care to inmates, especially in view of the obvious risk that the Constitution could be violated without such training and supervision." *Id.* at 741. These facts, combined with evidence that the company's president and other top officials

failed to train the LPNs, enforce existing policies, or adequately investigate or respond to the inmate's death, also supported a finding that the inadequate training resulted from the company's "own deliberate indifference to the rights of inmates with whom the nurses came into contact," *id.* at 742–43, and that the "inadequate training and supervision actually caused, or was closely related to, [the inmate's] injury and death," *id.* at 743.

Although some of the factors relevant in *Shadrick* are present here, there are also some important differences. In addition to LPNs, the jail employed nurses and medical providers with more advanced training and certifications (e.g., registered nurses (RNs), nurse practitioners (NPs), and physicians) to treat inmates. NPs, like Mirolovich, have Master's degrees in nursing, may assess and treat patients, and practice under a "collaborative agreement" with a physician. Mirolovich did not recall receiving or reviewing jail policies, but he did receive some training on providing care in the correctional setting during staff meetings. Nurses typically went through a two-week orientation training program when they began working at the jail and received and signed off on having reviewed a copy of the jail policies; policy updates were provided and discussed at staff meetings. There is no evidence that nurses were permitted to use the policies at their discretion or to define the scope of their practice and no indication that nurses or providers refused to provide care unless an inmate requested it. In sum, the County's training program is not so inadequate that failing to provide additional training constitutes deliberate indifference to an obvious risk of injury. *See id.* at 741.

## III.  CONCLUSION

For the reasons explained above, we **AFFIRM** the judgment of the district court.